IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

In re:

CAPITAL ONE 360 SAVINGS ACCOUNT
INTEREST RATE LITIGATION

MDL No. 1:24md3111 (DJN)

This document relates to
<u>ALL CASES</u>

### MEMORANDUM OPINION

Plaintiffs, citizens of eighteen different states and 360 Savings accountholders with

Capital One between September 2019 and the filing of the Consolidated Amended Complaint,

bring this multidistrict class action, on behalf of themselves and all others similarly situated,

against Defendants Capital One, N.A. ("CONA") and Capital One Financial Corp. ("COFC")

(collectively, "Defendants").  Plaintiffs' Consolidated Amended Complaint, (ECF No. 10

("CAC")), asserts twenty-three claims, including breach of contract and the implied covenant of

good faith and fair dealing, violations of the consumer protection or unfair trade practice statutes

of eighteen different states, unjust enrichment and promissory estoppel.  Plaintiffs seek to

represent a nationwide class "of all persons who have been Capital One 360 Savings

accountholders since Capital One created the 360 Performance Savings account," as well as

eighteen state subclasses including all such individuals in the states where the named Plaintiffs

reside.  (CAC ¶ 119.)  This matter now comes before the Court on Defendants' Motion to

Dismiss the Consolidated Amended Complaint.  (ECF No. 29 ("Motion").)

For the reasons set forth below, the Court will GRANT IN PART and DENY IN PART

Defendants' Motion to Dismiss (ECF No. 29).  This case shall proceed on all Counts, except for

Counts XVI, XX, XXII and XXIII.

## I.    BACKGROUND

This consolidated multidistrict action arises out of Defendants' alleged breach of contract and breach of the covenant of good faith and fair dealing, as well as violations of various state consumer protection and unfair trade practice statutes.  Plaintiffs seek to recover lost interest that Defendants' alleged conduct prevented them from earning on their "high interest" 360 Savings accounts.

### A.    Factual Background

At this stage, the Court must accept as true the facts set forth in the Consolidated Amended Complaint (ECF No. 10).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving the Motion.

The Consolidated Amended Complaint alleges that Defendants, acting in bad faith, cheated Plaintiffs and similarly situated 360 Savings accountholders out of higher interest payments by creating a duplicate savings account, 360 Performance Savings, and concealing from Plaintiffs the fact that their "high interest" 360 Savings accounts were earning much less interest than the 360 Performance Savings accounts.  (CAC ¶¶ 1–11.)  Defendant CONA, located in McLean, Virginia, is a national bank and wholly owned subsidiary of Defendant COFC.  (*Id.* ¶ 40.)  Defendant COFC is a holding company incorporated in Delaware and located in McLean, Virginia.  (*Id.* ¶ 41.)  Plaintiffs allege that Defendants CONA and COFC jointly operate Capital One's website, with the site's terms and conditions referring to "Capital One and its affiliates and related entities as 'we,' 'us' and 'our'" and specifically including COFC and CONA in this definition.  (*Id.* ¶ 53.)  Plaintiffs further allege that COFC's 2022 Form 10-K filed with the Securities and Exchange Commission ("SEC") states, "We maintain a website at

www.capitalone.com," and that its "deposits, which include . . . savings deposits . . . represent our largest source of funding for our assets and operations." (*Id.* ¶ 53.)

On February 17, 2012, Capital One announced that it purchased ING Direct USA, which at the time offered an online savings account to United States consumers called "ING Direct." (*Id.* ¶ 54.) On or about February 1, 2013, after the sale was finalized, ING Direct became "Capital One 360" and consumers with ING Direct savings accounts became Capital One "360 Savings" accountholders. (*Id.* ¶ 54.) Nearly all named Plaintiffs originally opened online savings accounts with ING Direct, which were then converted to Capital One 360 Savings accounts on or about February 1, 2013.[1] (*Id.* ¶ 55.) Plaintiffs allege that Capital One made several statements at the time of the transition to assure former ING Direct customers that their accounts would continue to feature a competitive, high interest rate. (*Id.* ¶ 57.) The 360 Savings Account Disclosures ("360 Disclosures"), made on behalf of CONA, state that "interest rates and annual percentage yields are variable and may change at any time at [CONA's] discretion." (*Id.* ¶¶ 58–59.) The 360 Disclosures also state that 360 Savings accounts "are subject to both federal law and the laws of the state of Virginia." (*Id.* ¶ 60.) Plaintiffs allege that Capital One advertised 360 Savings accounts as having "high interest" or a "great rate" from at least April 2013 until September 2019. (*Id.* ¶ 61.) In January 2018, with the federal funds effective rate rising, Capital One increased the rate on the 360 Savings account from 0.75% to 1.00%. (*Id.* ¶ 62.) Plaintiffs allege that Capital One would never raise the interest rate for 360 Savings accounts again. (*Id.* ¶ 63.)

On September 16, 2019, Capital One introduced a new online savings account titled "360 Performance Savings." (*Id.* ¶ 63.) Plaintiffs allege that, while Capital One's website showed the

---

[1]     Plaintiff Pitts opened her 360 Savings accounts in June 2017 and January 2019, following Capital One's acquisition of ING Direct. (CAC ¶ 107.)

360 Savings account as an online savings product on September 17, 2019, by the next day, all references to "360 Savings" were replaced with "360 Performance Savings," with no further explanation of the change. (*Id.* ¶ 63.) Capital One introduced the 360 Performance Savings account with a 1.90% annual percentage yield ("APY"), but kept the 360 Savings account rate at 1.00%. (*Id.* ¶ 64.) Plaintiffs allege that the 360 Performance Savings account has had a significantly higher interest rate than the 360 Savings account at every point since its creation. (*Id.* ¶ 64.) Plaintiffs further allege that Capital One concealed that 360 Performance Savings was a different product by not alerting existing 360 Savings accountholders to the new product and by burying all references to 360 Savings on its website. (*Id.* ¶ 65.) Further, Plaintiffs' monthly 360 Savings statements did not mention the 360 Performance Savings option with its higher APY. (*Id.* ¶ 65.) Plaintiffs allege that Capital One was financially motivated to withhold this information from 360 Savings accountholders and pay less interest than it did for 360 Performance Savings accounts. (*Id.* ¶ 66.)

Plaintiffs allege that, rather than adjust the variable interest rate for the 360 Savings accounts in good faith, Capital One dropped the rate for those accounts from 1.00% in October 2019 to 0.30% in December 2020. (*Id.* ¶ 67.) Plaintiffs claim that the 360 Savings rate has remained frozen at 0.30% since December 2020, despite increases in the federal funds rate. (*Id.* ¶ 67.) Meanwhile, Capital One has raised rates on 360 Performance Savings accounts in response to market conditions, and, as of August 2023, the rate paid for those accounts had risen to 4.30%. (*Id.* ¶¶ 68–70.) Plaintiffs allege that, consistent with consumers' reasonable expectations for "high interest" or "high yield" savings accounts, the rates on their accounts previously fluctuated with market conditions, both before Capital One's purchase of ING Direct USA and following their transition to 360 Savings accounts. (*Id.* ¶ 71.) Further, Plaintiffs allege

4

that the Account Disclosures for the 360 Performance Savings account contain identical language as the 360 Disclosures pertaining to variable interest rates, and therefore there exists no good faith explanation why CONA would use its discretion to offer higher rates for only 360 Performance Savings accountholders. (*Id.* ¶ 72.)

Plaintiffs allege that, rather than exercising discretion in good faith to raise rates for 360 Savings accountholders, Capital One instead created a new account with a similar name, while concealing from existing 360 Savings customers that it had changed the nature of its product at their expense. (*Id.* ¶ 73.)  Both products were labeled as either "high interest" or "high yield," two terms which Capital One acknowledges on its website as meaning the same thing. (*Id.* ¶ 74.) Since September 2019, Capital One's website has only mentioned the 360 Performance Savings account, and current accountholders cannot find information in their accounts discussing any differences between the 360 Savings and 360 Performance Savings products. (*Id.* ¶¶ 75–76.) Plaintiffs allege that although customers exercising reasonable diligence have no reason to review account statements at any given time, even conducting such a review does not provide any information about the two products and their differences. (*Id.* ¶ 77.)  Rather, Plaintiffs experienced confusion when comparing the APY listed on their account statements and the different rate listed for the only savings account marketed on Capital One's website — 360 Performance Savings. (*Id.* ¶ 77.)  Only those 360 Savings customers who contacted Capital One directly discovered that they would need to open a separate 360 Performance Savings account to obtain the higher advertised rate. (*Id.* ¶ 78.)  As a result of this conduct, Plaintiffs lost interest income proportionate to their account balances since September 2019. (*Id.* ¶ 79.)

Plaintiffs allege that Capital One acted deceptively, dishonestly, unfairly, in breach of its contract with 360 Savings accountholders and in violation of consumer protection statutes and

5

common law by furtively creating the 360 Performance Savings account without raising the 360 Savings rate or informing customers of the change. (*Id.* ¶ 80.) Plaintiffs state that no one "would choose the 360 Savings account over the 360 Performance Savings account" due to the latter's higher interest rate and their otherwise identical characteristics. (*Id.* ¶ 81.) Each named Plaintiff had a 360 Savings account for some period following the creation of the 360 Performance Savings account in September 2019, and thus each Plaintiff alleges that he or she has lost money from the lower interest payments. (*Id.* ¶ 83.) After speaking to Capital One representatives and discovering the lower interest rate assigned to their 360 Savings accounts, many Plaintiffs opened a 360 Performance Savings account or moved their money to another bank. (*Id.* ¶¶ 84–109.) Capital One's conduct, including the creation of the 360 Performance Savings account and lack of information provided to existing 360 Savings customers, has been criticized in various online articles, forums and videos. (*Id.* ¶¶ 110–17.)

This suit is brought by Plaintiffs, for themselves and on behalf of all Capital One 360 Savings accountholders since Capital One created the 360 Performance Savings account, as a class action pursuant to Federal Rule of Civil Procedure 23. (*Id.* ¶ 119.) Individual Plaintiffs also seek to represent subclasses for all 360 Savings accountholders in their respective states. (*Id.* ¶ 119(a)–(r).) Plaintiffs allege numerosity, typicality, common questions of law and fact, and that they will adequately represent and protect the interests of the class. (*Id.* ¶¶ 122–25.) Plaintiffs further allege that the class qualifies as readily identifiable, that a class action proves superior to any other method for fair and efficient adjudication of the case, and that any injunctive or declaratory relief would appropriately apply generally to the whole class. (*Id.* ¶¶ 126–28.) Plaintiffs and all class members have uniformly relied on Defendants' conduct in

maintaining the 360 Savings accounts, which earned materially lower interest rates than the 360

Performance Savings account. (*Id.* ¶ 129.)

### B.   Procedural History

On July 1, 2024, Plaintiffs filed the CAC, raising twenty-three counts for relief based on

the above allegations. (ECF No. 10.) The counts are as follows. Count I brings a claim against

CONA for breach of contract and breach of the covenant of good faith and fair dealing under

Virginia law for paying a materially lower rate of interest for 360 Savings accounts after creating

the 360 Performance Savings product. (*Id.* ¶ 135.) Count II alleges that COFC violated the

Virginia Consumer Protection Act ("VCPA") by furtively creating the 360 Performance Savings

account while paying a lower rate on the "high interest" 360 Savings account without informing

customers. (*Id.* ¶ 139–40.)

Counts III through XXI assert claims for the same conduct alleged above under the

consumer protection and unfair trade practice laws of seventeen different states against both

Defendants, unless otherwise noted:

- Count III:  California Consumer Legal Remedies Act ("CLRA") (*Id.* ¶¶ 150–51);
- Count IV:  California Unfair Competition Law ("UCL") (*Id.* ¶¶ 159–62);
- Count V:  Texas Deceptive Trade Practices Act ("Texas DTPA") (*Id.* ¶¶ 171–73);
- Count VI:  New York General Business Law Sections 349 and 350 (*Id.* ¶¶ 179–80);
- Count VII:  New Jersey Consumer Fraud Act ("NJCFA") (*Id.* ¶ 188);
- Count VIII:  Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (*Id.* ¶¶ 192–93);
- Count IX:  Massachusetts Chapter 93A (*Id.* ¶¶ 200–01);
- Count X:  Illinois Consumer Fraud and Deceptive Business Practice Act ("ICFA") (*Id.* ¶¶ 209–10);
- Count XI:  Maryland Consumer Protection Act ("MCPA") (*Id.* ¶¶ 216–17);
- Count XII (against COFC only):  Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (*Id.* ¶¶ 222–23);
- Count XIII:  North Carolina Unfair and Deceptive Trade Practices Act ("NC UDTPA") (*Id.* ¶¶ 228–29);
- Count XIV:  Georgia Fair Business Practices Act ("Georgia FBPA") (*Id.* ¶¶ 237–39);
- Count XV:  Oregon Unlawful Trade Practices Act ("Oregon UTPA") (*Id.* ¶¶ 247–49);
- Count XVI:  Ohio Deceptive Trade Practices Act ("Ohio DTPA") (*Id.* ¶¶ 254–56);

7

- Count XVII:  Michigan Consumer Protection Act ("Michigan CPA") (*Id.* ¶¶ 267–68);
- Count XVIII:  Missouri Merchandising Practices Act ("MMPA") (*Id.* ¶ 278);
- Count XIX:  Nebraska Consumer Protection Act ("Nebraska CPA") (*Id.* ¶ 285);
- Count XX:  Nebraska Uniform Deceptive Trade Practices Act (*Id.* ¶¶ 290–91);[2]
- Count XXI:  Delaware Consumer Fraud Act ("Delaware CFA") (*Id.* ¶ 299).

Count XXII brings a claim for unjust enrichment against Defendants, who knowingly retained Plaintiffs' deposits while paying less interest than Plaintiffs should have rightfully received. (*Id.* ¶ 304.) Lastly, Count XXIII brings a claim for promissory estoppel, based on Plaintiffs' reliance on Defendants' promises of high interest for their 360 Savings accounts. (*Id.* ¶¶ 308–10.) Based upon the foregoing claims, Plaintiffs seek class certification; an award of damages, including punitive damages and treble damages; an award of restitution and/or disgorgement; an award of costs, attorneys' fees and pre- and post-judgment interest; an order declaring Defendants' conduct unlawful and enjoining Defendants from that unlawful conduct; and any other relief that the Court deems appropriate. (*Id.* ¶¶ 312–18.)

On July 26, 2024, Defendants filed the instant Motion to Dismiss the Consolidated Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 29.) Defendants first argue that Plaintiffs fail to state a plausible claim against COFC. (ECF No. 30 ("Mem.") at 26–27.)[3] Defendants further argue that each of Plaintiffs' claims against CONA stands preempted by the National Bank Act ("NBA"). (*Id.* at 28–38.) Defendants also contend that Plaintiffs fail to state a claim for breach of the implied covenant of good faith and fair dealing under Count I. (*Id.* at 38–44.) Defendants additionally argue that Plaintiffs' state statutory claims fail, either for independent threshold reasons or because they do not plausibly

---

[2]    The parties agree that Count XX should be dismissed. (ECF No. 39 at 61 n.39.)  Thus, the Court will dismiss Count XX without analysis.

[3]    The Court's citations use the pagination assigned by the ECF system, rather than the parties' pagination in their respective briefs.

plead all elements of each claim.  (*Id.* at 45–62.)  And, lastly, Defendants argue that Plaintiffs fail to state claims for unjust enrichment and promissory estoppel.  (*Id.* at 62–66.)  On August 23, 2024, Plaintiffs filed their Opposition to Defendants' Motion to Dismiss.  (ECF No. 39 ("Opp.").)  On September 13, 2024, Defendants filed their Reply in Support of the Motion to Dismiss, (ECF No. 40 ("Reply")), rendering Defendants' Motion to Dismiss ripe for review.

## II.     STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint; it does not serve as the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a motion to dismiss, the Court accepts the plaintiff's well-pleaded allegations in the complaint as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted).  Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570.  Thus, a complaint must assert facts that are more than "merely consistent with"

the other party's liability. *Id.* at 557.  The facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (first citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); and then citing *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

Federal Rule of Civil Procedure 9(b) further requires plaintiffs alleging claims sounding in fraud to "state with particularity the circumstances constituting fraud," though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Rule 9(b) requires plaintiffs to plead fraud with particularity, including "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Barry v. Novartis Pharms. Corp.*, 2022 WL 2373452, at *11 (E.D. Va. June 30, 2022) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).  A plaintiff must also plead "reasonable, detrimental reliance . . . with particularity." *Xia Bi v. McAuliffe*, 927 F.3d 177, 184 (4th Cir. 2019) (citations omitted) (explaining that the rationale behind Rule 9(b)'s heightened pleading standard "applies with special force to allegations of reliance, which inherently rest on information within a plaintiff's possession").  Rule 9(b) seeks "to provide defendants with fair notice of claims against them and the factual ground upon which they are based." *McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 559 (4th Cir. 2013).  Thus, "lack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." *Harrison*, 176 F.3d at 783 n.5.

### III.    ANALYSIS

The Court begins by considering Defendants' preemption argument, before turning to Defendants' assertion that Plaintiffs fail to state a claim against COFC.  The Court will then address Defendants' contention that Plaintiffs have not stated a claim for breach of the implied

covenant of good faith and fair dealing under Count I.  Subsequently, the Court will assess

Defendants' choice-of-law challenge and their various arguments that Plaintiffs' statutory claims

(Counts II through XXI) fail for independent threshold reasons, before analyzing Defendants'

assertions that Plaintiffs fail to allege certain elements of the statutory claims.  Lastly, the Court

will address Defendants' arguments that Plaintiffs' have not stated actionable claims for unjust

enrichment and promissory estoppel.

      Ultimately, the Court finds that none of Plaintiffs' claims stand preempted by the NBA,

and that Plaintiffs may assert a claim against COFC.  Further, the Court finds that Plaintiffs state

a claim for breach of the implied covenant of good faith and fair dealing, and that the 360

Disclosures' choice-of-law provision does not prevent Plaintiffs from asserting their claims

under the substantive laws of other states.  The Court also rejects Defendants' arguments that

Plaintiffs fail to allege certain elements of their state statutory claims.  However, the Court finds

that Plaintiffs lack standing to state a claim under the Ohio DTPA and accordingly will dismiss

Count XVI.  The Court also finds that Plaintiffs' alternative claims for unjust enrichment (Count

XXII) and promissory estoppel (Count XXIII) must be dismissed, because the 360 Disclosures

constitute a valid and enforceable contract between the parties.  Lastly, the Court will dismiss

Plaintiffs' claim under the Nebraska Uniform Deceptive Trade Practices Act (Count XX) on the

parties' voluntary agreement.

      **A.**    **Preemption**

      "Business activities of national banks are controlled by the National Bank Act (NBA or

Act), 12 U.S.C. § 1 *et seq.*, and regulations promulgated thereunder by the Office of the

Comptroller of the Currency (OCC)."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 6 (2007).

The NBA vests in nationally chartered banks specific enumerated powers and "all such

incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24.

OCC regulations specifically authorize national banks to "receive deposits and engage in any

activity incidental to receiving deposits." 12 C.F.R. § 7.4007(a). Under the NBA, Congress

created a "mixed state/federal regime[] in which the Federal Government exercises general

oversight while leaving state substantive law in place." *Cuomo v. Clearing House Ass'n, LLC*,

557 U.S. 519, 530 (2009).

The Supreme Court has interpreted national banks' enumerated and incidental powers "as

grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state

law." *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996). However, national

banks remain "subject to state laws of general application in their daily business to the extent

[that] such laws do not conflict with the letter or the general purposes of the NBA [or OCC

regulations]." *Watters*, 550 U.S. at 11. "Whether a state law is preempted by federal law is a

legal question." *Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 320 (4th Cir. 2012).

While "[c]ourts generally apply a presumption against preemption in fields the states

traditionally regulate," such a presumption does not exist in the context of national banking

powers. *Nat'l City Bank of Ind. v. Turnbaugh*, 463 F.3d 325, 330–31 (4th Cir. 2006).

### 1.    Precedent

In its recent decision in *Cantero v. Bank of America, N.A.*, 602 U.S. 205 (2024), the

Supreme Court reiterated the standard for national banking preemption as previously articulated

in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996). *Cantero*, 602 U.S. at

219–20. In *Cantero*, the Supreme Court noted that the Dodd-Frank Act of 2010 "expressly

incorporated" the *Barnett Bank* standard. *Id.* at 209 (citing 12 U.S.C. § 25b(b)(1)(B)). That

standard holds that national banking laws and regulations preempt a state consumer financial law

if the state law "prevents or significantly interferes with the exercise by the national bank of its [enumerated or incidental] powers." 12 U.S.C. § 25b(b)(1)(B); *Barnett Bank*, 517 U.S. at 33. The *Cantero* Court summarized the *Barnett Bank* opinion, emphasizing that the Court reviewed its precedents to examine whether a challenged law fell "on the permissible or preempted side of the significant-interference line." *Cantero*, 602 U.S. at 219. Notably, the *Barnett Bank* standard does "not draw a bright line," but rather "carefully account[s] for and navigate[s] [the Supreme] Court's prior bank preemption cases" to determine which laws stand preempted. *Id.* at 221.

As the Supreme Court did in *Cantero*, this Court will briefly review the cases examined in *Barnett Bank* to establish a representative precedential set of preempted and non-preempted state laws. First, in *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954), a New York law prohibited banks "from using the word 'saving' or 'savings' in their advertising." *Id.* at 374. The Supreme Court found the state law to be preempted, because it significantly interfered with the national bank's authority "to receive savings deposits." *Id.* at 374, 378–79. The Court held that national banks had authority not only to receive deposits but also "to let the public know about" their business without state law substantially impairing that power. *Id.* at 378.

In *Fidelity Federal Savings & Loan Association v. De la Cuesta*, 458 U.S. 141 (1982), the Court held that federal law preempted a California law that limited the right of national banks to include due-on-sale clauses in contracts. *Id.* at 154–55. The state law at issue interfered with "the flexibility given" to a national bank that, under federal law, could exercise a due-on-sale clause "solely at its option." *Id.* at 155.

Then, in *Barnett Bank* itself, the Court held that a Florida law prohibiting most banks from selling insurance stood preempted, because the statute interfered with national banks'

13

federal authorization to sell insurance. *Barnett Bank*, 517 U.S. at 33–35. Because federal law afforded national banks "broad" power to sell insurance with "no indication that Congress intended to subject that power to local restriction," the Florida law "significantly interfere[d] with the national bank's exercise of its powers." *Id.* at 32–33, 35.

In contrast to the laws scrutinized in *Franklin*, *Fidelity* and *Barnett Bank*, a Kentucky law requiring banks to turn over abandoned deposits to the state was not preempted. *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 248 (1944). The Supreme Court determined that the Kentucky statute did not "infringe the national banking laws or impose an undue burden on the performance of the banks' functions," because the law merely allowed the state to demand payment of the accounts only after demonstrating the accountholder's abandonment. *Id.* at 248–49. In *Anderson*, the Court distinguished the Kentucky abandoned deposit law from a California law that allowed the state to claim deposits that went "unclaimed for more than twenty years." *First Nat'l Bank of San Jose v. California*, 262 U.S. 366, 366 (1923). The California statute at issue in *First National Bank of San Jose* did not require proof of abandonment and therefore "attempt[ed] to qualify in an unusual way agreements between national banks and their customers." *Id.* at 370. Thus, the California law improperly operated to interfere with the national bank's "efficiency" in receiving deposits. *Id.* at 369.

In *National Bank v. Commonwealth*, 76 U.S. 353 (1870), the Supreme Court also found no preemption where a Kentucky law taxed the shareholders of all banks on their shares of bank stock. *Id.* at 360. In that case, the Court stated that national banks stood subject to generally applicable state laws governing "their daily course of business," and held that the Kentucky tax law at issue did not interfere with banking operations. *Id.* at 362–63.

14

Lastly, *Barnett Bank* addressed *McClellan v. Chipman*, 164 U.S. 347 (1896), in which a generally applicable Massachusetts contract law was not preempted. *Id.* at 357–58. Because the state law did not "in any way impair[] the efficiency of national banks, or frustrate[] the purpose for which they were created," the Court found preemption to be inapplicable. *Id.* at 358.

### 2.    Application

As demonstrated in these representative cases, a reviewing court "make[s] a practical assessment of the nature and degree of the interference caused by a state law" by looking to "the text and structure of the laws, comparison to other precedents, and common sense." *Cantero*, 602 U.S. at 219–20, 220 n.3. The Court will now conduct such a "practical assessment" by reviewing each of Plaintiffs' claims. Upon performing this review, and as detailed below, the Court finds that none of Plaintiffs' claims stand preempted by the NBA.

At the outset, the Court acknowledges that all of Plaintiffs' claims contain the same nucleus of allegations. Plaintiffs "re-allege and incorporate all other factual allegations" in each Count. (*See, e.g.*, CAC ¶¶ 176, 184.) Each Count also emphasizes the same alleged conduct taken by Capital One: (1) the furtive creation of the similarly named 360 Performance Savings account, which featured a higher APY than the 360 Savings account, and the failure to pay 360 Savings accountholders the same APY; (2) the concealment of the fact that the 360 Performance Savings account was not Capital One's only online savings account and that the 360 Savings account continued to exist with a much lower interest rate; and (3) the failure to correct representations that the 360 Savings account was a "high interest" savings account, even though it paid a rate that was not "high interest" relative to the 360 Performance Savings account. (*See, e.g., id.* ¶ 150.)

15

Defendants contend that Plaintiffs' state common law and statutory claims would "significantly interfere" with CONA's federally granted power as a national bank to "receive deposits and engage in any activity incidental to receiving deposits," including the ability to pay interest on deposits. (Mem. at 31 (quoting 12 C.F.R. § 7.4007(a)).) Defendants cite to *Rose v. Chase Bank, USA, N.A.*, 513 F.3d 1032 (9th Cir. 2008), in which the Ninth Circuit stated that "[r]egardless of the nature of the state law claim alleged, however, the proper inquiry is whether the 'legal duty that is the predicate of' Plaintiffs' state law claim falls within the preemptive power of the NBA or regulations promulgated thereunder." *Id.* at 1038 (quoting *Cipollone v. Liggett Grp., Inc.* 505 U.S. 504, 524 (1992)); (Mem. at 30). Defendants assert that Plaintiffs seek to impose a "legal duty" for Defendants to raise the interest rate on their 360 Savings accounts. (Mem. at 30.) Plaintiffs appear to agree, in part, with such a characterization, stating that they "seek to apply . . . the nationally uniform rate that CONA itself chose to advertise and pay for 360 Performance Savings." (Opp. at 24.)

In seeking to determine the "legal duty that is the predicate of Plaintiffs' state law claim[s]," the Court identifies two potential duties in play here: (1) a duty to pay a mandatory interest rate to holders of a national bank savings account and (2) a duty not to engage in fraud or deception in setting interest rates for savings accounts. *Rose*, 513 F.3d at 1038. As the Court explains below, any statute or claim purporting to impose the first duty clearly would stand preempted as a significant interference with a national bank's power to "receive deposits and engage in any activity incidental to receiving deposits." 12 C.F.R. § 7.4007(a). However, the Court finds that the second duty, which Plaintiffs actually seek to impose through their various state law consumer protection claims, does not demand preemption, because requiring banks not to engage in deception or fraud in setting the interest rates for savings accounts "do[es] no more

16

than incidentally affect the banks' exercise of their deposit taking power." *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d 1302, 1313 (S.D. Fla. 2010).

a.      **Duty to Pay a Mandatory Interest Rate**

The Court agrees with Defendants that a requirement to impose a specific interest rate, to the extent that Plaintiffs seek this through their common law or statutory claims, would "significantly interfere" with CONA's federal grant of authority to "receive deposits and engage in any activity incidental to receiving deposits." 12 C.F.R. § 7.4007(a).[4] Returning to the cases addressed in *Barnett Bank* and reviewed in *Cantero*, the Court finds that a claim imposing a mandatory interest rate stands analogous to the preempted claims in *Franklin*, *Fidelity*, and *Barnett Bank*.

The state law at issue in *Franklin* prohibited banks "from using the word 'saving' or 'savings' in their advertising" and stood preempted, because it prevented banks from letting "the public know about" their business. 347 U.S. at 374, 378. Here, a requirement to impose a specific interest rate — whether that rate were determined by Plaintiffs, a state legislature or a court — would constitute an even more severe interference with national banks' fundamental power to receive deposits. Similarly, the California law in *Fidelity* stood preempted, because it limited the right of national banks to include due-on-sale clauses in contracts and interfered with "the flexibility given" to banks to choose when to apply such a clause. 458 U.S. at 154–55. In

---

[4]     Plaintiffs note that Defendants cite *Hamilton National Bank v. District of Columbia*, 156 F.2d 843 (D.C. Cir. 1946) for the proposition that national banks are "fully authorized to receive savings deposits and pay interest on them." *Id.* at 845; (Opp. at 24 n.5). Plaintiffs assert that *Hamilton* cited 12 U.S.C. § 371, which was subsequently amended to remove language that expressly permitted payment of interest on savings deposits. (Opp. at 24 n.5.) Regardless of whether any federal law expressly grants national banks the power to pay interest on savings deposits, that power is certainly "incidental" to the power to receive deposits. 12 C.F.R. § 7.4007(a). The relevant inquiry, therefore, remains whether a state claim involving interest rates "prevents or significantly interferes" with a national bank's power to collect deposits. 12 U.S.C. § 25b(b)(1)(B); *see also Barnett Bank*, 517 U.S. at 33.

17

this case, a mandated interest rate would significantly interfere with banks' "flexibility" to choose applicable rates for their savings products. The *Barnett Bank* Court found a Florida law that prohibited banks from selling insurance to be preempted, because there existed "no indication that Congress intended to subject [national banks' power to sell insurance] to local restriction." *Barnett Bank*, 517 U.S. at 33–35. Here, there exists "no indication that Congress intended to subject" national banks to a mandated interest rate for deposit accounts, regardless of whether Plaintiffs, state legislatures or courts determined such a rate.

In contrast to the non-preempted generally applicable Massachusetts contract law in *McClellan*, a state law claim requiring the imposition of a mandated interest rate here would "impair[] the efficiency of national banks, or frustrate[] the purpose for which they were created." 164 U.S. at 357–58. As Defendants assert, national banks, including CONA, would potentially be required to keep track of various state-mandated rates or face innumerable suits pertaining to plaintiffs' requested rates across the nation. (Mem. at 31 (citing *Easton v. Iowa*, 188 U.S. 220, 231–32 (1903) ("[C]onfusion would necessarily result from control possessed and exercised by two independent authorities.")).) Furthermore, a mandated interest-rate scheme would allow plaintiffs, states or courts "to micro-manage the deposit procedures of banks [and] would intrude far into the realm reserved for federal law when regulating national banking institutions." *1409 W. Diversey Corp. v. JPMorgan Chase Bank, N.A.*, 2016 WL 4124293, at *2 (N.D. Ill. Aug. 3, 2016). As courts have found, "the level of 'interference' that gives rise to preemption under the NBA is not very high." *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009) (citation omitted); *see also Am. Bankers Ass'n v. Lockyer*, 239 F. Supp. 2d 1000, 1017 (E.D. Ca. 2002) ("The threshold of preemption is in some cases remarkably

18

low."). Thus, any claim requiring the establishment of a mandated interest rate on savings deposits easily clears the bar for significant interference.

Courts have found claims seeking to impose similar mandates on national banks to be preempted. For example, in *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712 (9th Cir. 2012), the Ninth Circuit reversed a district court-ordered permanent injunction that required the national bank to eliminate a "high-to-low" posting order for debit card transactions. *Id.* at 725. The court noted that a "federal court cannot mandate the order in which Wells Fargo posts its transactions" and therefore vacated the injunctive remedy, which stemmed from a preempted California state statutory claim. *Id.* Similarly, in *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194 (11th Cir. 2011), the Eleventh Circuit held that a Florida law preventing banks from charging non-customers a fee when cashing a check stood preempted. *Id.* at 1197–98. Because the state statute prohibited conduct that was specifically authorized under OCC regulations, the court determined that the law crossed the *Barnett Bank* threshold for "substantial interference." *Id.* at 1198 ("The state's prohibition on charging fees to non-account-holders, which reduces the bank's fee options by 50%, is in substantial conflict with federal authorization to charge such fees."). Furthermore, a California state law requiring that "certain language and information be placed on the billing statements credit card issuers provide their cardholders" also stood preempted because "the burdens imposed . . . are substantial." *Lockyer*, 239 F. Supp. 2d at 1002, 1018. In that case, the court looked to the OCC's interpretation of the NBA and stated that the "terms and conditions of extensions of credit as well as management of credit accounts are powers 'at the heart' of the NBA authority to lend money." *Id.* at 1018.

Here, a mandated interest rate on CONA's 360 Savings account, whether imposed under state common or statutory law, falls with the challenged laws in *Gutierrez*, *Baptista* and *Lockyer*

19

on the preempted side of the *Barnett Bank* "significant interference" spectrum.  As courts have

noted, "[t]he focus is not on whether a particular state law is 'directed at' banks, but rather

whether, when applied, the law runs afoul of federal law." *Hawthorne v. Umpqua Bank*, 2013

WL 5781608, at *12 (N.D. Cal. Oct. 25, 2013).  A state law claim that would seek to impose a

specific interest rate on CONA's 360 Savings account, when applied, runs afoul of the *Barnett*

*Bank* standard and would constitute an overreach into national banks' power to receive deposits,

including the incidental power to determine appropriate interest rates on those deposits.  *See* 12

C.F.R. § 7.4007(a) ("A national bank may receive deposits and engage in any activity incidental

to receiving deposits.").  As argued by Defendants and addressed above, a legal duty to impose a

specified interest rate on deposits would potentially leave national banks subject to different rate

requirements in each state.  (Mem. at 31.)  Alternatively, courts could be called on to determine

appropriate rates.  Such a reality would not only interfere with national banks' federally granted

powers, but also inhibit judicial economy and encourage plaintiffs to sue any time they desired a

higher rate on their savings accounts.

 In line with the Supreme Court precedents addressed in *Barnett Bank* and *Cantero*, as

well as persuasive authority from other federal courts, the Court determines that any claim

mandating a specific interest rate, to the extent that Plaintiffs make such a claim, would

"significantly interfere[]" with national banks' authority under the NBA and OCC regulations to

receive deposits.  Accordingly, to the extent that Plaintiffs' state law claims sought to impose a

mandated interest rate for their 360 Savings accounts, those claims would stand preempted.

### b. Duty to Act Without Deception or Concealment

 However, upon close review of the CAC, the Court finds that Plaintiffs' state common

law and statutory claims do not seek to impose mandatory interest rates on national banks, but

rather seek to impose a "legal duty" upon Defendants to act without fraud or deception in setting the interest rates for their savings products. *Rose*, 513 F.3d at 1038. As mentioned above, each of Plaintiffs' Counts alleges the following conduct taken by Capital One: (1) the furtive creation of the similarly named 360 Performance Savings account; (2) the concealment of the fact that the 360 Performance Savings account was not Capital One's only online savings account and that the 360 Savings account carried a lower interest rate; and (3) the failure to correct representations that the 360 Savings account was a "high interest" savings account. (*See, e.g.*, CAC ¶ 150.) Without knowledge of the distinction between their 360 Savings accounts and the new 360 Performance Savings product, Plaintiffs relied upon 360 Savings' "high interest" label, assuming that they in fact were receiving Capital One's "high interest" savings rate, and accordingly allege that they lost money that they otherwise could have earned. (*See, e.g., id.* ¶¶ 152–53.) Because Plaintiffs' claims therefore seek to impose a duty on Defendants to avoid deception and concealment in setting interest rates and in dealing with savings accountholders, the Court finds those claims not preempted.[5]

A "practical assessment" and "comparison to other precedents" supports this finding. *Cantero*, 602 U.S. at 219–20, 220 n.3. *Gutierrez*, discussed above, provides a useful starting point. In that case, the Ninth Circuit reviewed a claim brought under California's UCL, the same statute under which Plaintiffs bring Count IV in this matter. *Gutierrez*, 704 F.3d at 726; (CAC

---

[5]      The Court acknowledges that each of Plaintiffs' state law claims, including a claim for breach of contract and the implied covenant of good faith and fair dealing under Virginia law, statutory claims from eighteen different states, and common law claims for unjust enrichment and promissory estoppel, contain different elements and are subject to a variety of arguments for dismissal. The Court will address Defendants' various arguments in support of dismissal of each Count below. For the purposes of the preemption analysis, however, the Court draws on Plaintiffs' repeated factual allegations to find that each state law claim would seek to impose a legal duty on national banks to avoid fraud and deception in their conduct with savings accountholders.

21

¶¶ 156–65). In finding a claim for the bank's alleged misleading statements under the UCL's "fraudulent prong" not preempted, the court noted that the OCC "specifically cited [the UCL] in an advisory letter cautioning banks that they may be subject to such laws that prohibit unfair or deceptive acts or practices." *Id.* (quoting *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010)). The OCC letter warns banks of the "consequences of engaging in practices that may be unfair or deceptive under federal or state law." *Id.* (quoting OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices, 2002 WL 521380, at *1 (Mar. 22, 2002)). The court also stated that the OCC recognizes that laws surviving preemption "typically do not regulate the manner or content of the business of banking . . . but rather establish the legal infrastructure that makes practicable the conduct of that business." *Id.* at 726–27 (citation omitted).

Here, Plaintiffs' state law claims do not mandate specific actions or content; rather, the common law and statutory claims merely require national banks not to utilize deception and concealment when setting interest rates and dealing with savings accountholders. As such, these laws "establish the legal infrastructure" by which individuals harmed by fraud, deception or unfairness can seek recourse. *Gutierrez*, 704 F.3d at 727. To preempt these generally applicable laws would in essence leave potential victims susceptible to fraudulent or deceptive practices with no ability to hold the offending national bank liable for unlawful behavior. *See McClellan*, 164 U.S. at 358 (holding that generally applicable state contract law did not "in any way impair[] the efficiency of national banks or frustrate[] the purpose for which they were created").

The NBA does not preempt state law claims when the allegations "do no more than incidentally affect the banks' exercise of their deposit taking power." *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d 1302, 1313–14 (S.D. Fla. 2010). In *In re Checking Account*

*Overdraft Litigation*, the court noted that while 12 C.F.R. § 7.4002 gives banks the right to charge overdraft fees, "it does not authorize banks to ignore general contract or tort law." *Id.* at 1313.  The court further stated that "[a] bank could follow both the requirements of sound banking judgment outlined in [12 C.F.R.] § 7.4007 and good faith; these [principles] are not in irreconcilable conflict." *Id.*  Ultimately, the court found that the plaintiffs' claims "[were] *not* that banks lack the right to charge overdraft fees as part of their deposit-taking powers" but rather they "attack[ed] the allegedly unlawful manner in which the banks operate their overdraft programs." *Id.* (emphasis in original).  Accordingly, the NBA did not preempt plaintiffs' state contract and tort claims. *Id.* at 1314.

Here, the generally applicable state common law and statutory claims under which Plaintiffs seek relief do not assert that national banks "lack the right" to set interest rates for savings accounts, nor do they impose mandatory interest rates on banks.  Rather, the state law claims merely seek to protect consumers from "the allegedly unlawful manner" in which banks can set those rates. *Id.* at 1313.  Thus, Plaintiffs' claims "do no more than incidentally affect the banks' exercise of their deposit taking power." *Id.* at 1313–14.

Courts have routinely held that state law claims attacking the manner in which national banks charge overdraft fees and post transactions are not preempted. *See, e.g.*, *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 47–48 (E.D.N.Y. 2014) (holding that the NBA did not preempt plaintiffs' state claims, which did not "seek a blanket prohibition on high-to-low posting" but rather sought "recovery based on HSBC's alleged manipulation of their debit and checking charges").  In *In re HSBC Bank*, the court noted that while national banks have the right to charge overdraft fees, they cannot "ignore general contract or tort law." *Id.* at 46 (citing *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d at 1313).  The court found

23

that, like the plaintiffs' claims in *In re Checking Account Overdraft Litigation*, the state law

claims in *In re HSBC Bank* attacked the "allegedly unlawful manner" of the bank's overdraft

program and therefore did not significantly interfere with the bank's federal power. *Id.* at 48

(citing *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d at 1313); *see also McNeil v. Cap.*

*One Bank, N.A.*, 2020 WL 5802363, at *1 (E.D.N.Y. Sept. 29, 2020) (finding no preemption of

New York contract and statutory claims because plaintiff did not "challenge Capital One's right

to charge an overdraft or non-sufficient funds ("NSF") fees," but rather alleged that "Capital One

abused its power to assess NSF fees"); *Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012, 1025 (E.D.

Ark. 2015) (finding no preemption because plaintiffs did not challenge the bank's "authority or

ability to charge overdraft fees," but rather "challenge[d] the alleged manner in which debt-card

transactions are reorganized").

      Plaintiffs' state law claims here stand analogous to those addressed in these cases. The

underlying state consumer protection laws do not prevent national banks, including CONA, from

applying a given interest rate to their savings accounts, as they are federally authorized to do.

*See* 12 C.F.R. § 4.7007(a) ("A national bank may receive deposits and engage in any activity

incidental to receiving deposits."). Rather, the state law claims at issue "attack the allegedly

unlawful manner" in which CONA set and advertised the rate for the 360 Savings account. *In re*

*Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d at 1313. Specifically, Plaintiffs allege that

Capital One promoted the 360 Savings account as a "high interest" savings product, despite the

fact that the 360 Savings interest rate was not "high" relative to the rate applied to the otherwise

"materially identical" 360 Performance Savings account. (CAC ¶¶ 71–74.) Further, Plaintiffs

allege that Defendants removed any reference to the 360 Savings account from Capital One's

website in September 2019, leaving 360 Savings accountholders unable to understand the

distinction between 360 Savings and the new, similar sounding 360 Performance Savings. (*Id.* ¶¶ 75–76.)

The generally applicable state laws involved in this case do not mandate a higher interest rate, but rather hold banks accountable for fraud, deception, bad faith or unfair behavior in setting and advertising interest rates for their savings accounts. While the laws at issue certainly touch on national banks' power to receive deposits, "an expansive interpretation [of preemption] — with no limiting principle — would swallow all laws." *Gutierrez*, 704 F.3d at 727 (quoting *Aguayo v. U.S. Bank*, 653 F.3d 912, 925 (9th Cir. 2011)). The ultimate test remains *Barnett Bank*'s "substantial interference" standard, with laws surviving preemption when they fail to "impair[] the efficiency of national banks, or frustrate[] the purpose for which they were created." *McClellan*, 164 U.S. at 358. Generally applicable state law claims that merely require banks to act honestly, lawfully and without deception in their business dealings cannot be said to impair a bank's efficiency in receiving deposits or awarding interest on those deposits. Accordingly, to the extent that Plaintiffs' claims impose a "legal duty" upon Defendants to act without deception and concealment in setting interest rates on their online savings accounts, the Court determines that federal law does not preempt those state law claims.

Defendants express concern that CONA "would have to offer a variety of minimum rates implied through a patchwork of state-level laws — potentially subjecting CONA to as many minimum interest rates as there are distinct jurisdictions." (Mem. at 31.) However, as noted above, these state statutory and common law claims, which stem from the same general nucleus of factual allegations, merely seek to prohibit conduct that is fraudulent, deceptive, unlawful or made in bad faith. None of the laws require the imposition of a minimum interest rate. Further, the Court already determined that any claim mandating such a specified interest rate would stand

preempted.  Plaintiffs bring claims under the laws of eighteen different states, but those claims all seek the same goal:  protecting consumers and promoting fair business practices.  The crux of preemption is not how many laws of different jurisdictions a bank may be subject to, "but whether, when applied, the law[s] run[] afoul of federal law."  *Hawthorne*, 2013 WL 5781608, at *12.  For the reasons already discussed, Plaintiffs' generally applicable state law claims do not.

Defendants further argue that Plaintiffs' claims stand preempted to the extent that they seek to require Defendants to take "affirmative steps to notify existing 360 Savings accountholders like Plaintiffs of the new Performance Savings product."  (Mem. at 37.) Defendants assert that the NBA preempts any state law requirements of specific disclosures, because national banks have the power to accept deposits "without regard to state law limitations concerning . . . [d]isclosure requirements."  (Mem. at 37 (quoting 12 C.F.R. § 7.4007(b)(3)).) Plaintiffs counter this argument, asserting that their claims do not demand any specific disclosures.  (Opp. at 29.)

Courts have routinely held that state laws requiring specific disclosures are preempted by federal law.  For example, in *Martinez v. Wells Fargo Home Mortgage, Inc.*, 598 F.3d 549 (9th Cir. 2010), the Court found plaintiffs' claim to be preempted, because it sought relief for the bank's "failing to disclose actual costs of its underwriting and tax services."  *Id.* at 554, 557. Because federal regulations expressly authorize banks to "make real estate loans . . . without regard to state law limitations concerning . . . [d]isclosure and advertising," plaintiffs' claims seeking disclosure of costs stood preempted.  *Id.* at 556–57 (quoting 12 C.F.R. § 34.4(a)); *see also Rose*, 513 F.3d at 1038 (finding that federal law preempts disclosure obligations of California statute that required credit card issuers to include specific language with preprinted checks or drafts); *Smith v. Wells Fargo Bank, N.A.*, 158 F. Supp. 3d 91, 105–06 (D. Conn. 2016)

26

(concluding that the NBA preempted a Connecticut statutory claim that sought to impose heightened disclosure requirements for loan documents). In *In re HSBC Bank*, the court also found that "inasmuch as the Plaintiffs seek to impose liability on HSBC for the bank's failure to sufficiently disclose its posting method, that argument is preempted." 1 F. Supp. 3d at 48 (citing *Gutierrez*, 704 F.3d at 726).

However, "when a state law claim rests on activity other than requiring certain disclosures, it may avoid preemption." *Smith*, 158 F. Supp. 3d at 105 (citing *Gutierrez*, 704 F.3d at 727). Thus, while a "state law cannot require a bank to make certain disclosures, it can still insist that[b]anks operate free from fraud and other deceptive business practices." *Id. Burns v. TD Bank, N.A.*, 2022 WL 17547258 (D.N.J. Dec. 8, 2022) is instructive. In that case, the court noted that plaintiffs did not argue "that TD Bank lacks the right to choose its own disclosures" or "demand any specific disclosure be included in the Account Agreement." *Id.* at *13. Instead, the court found that plaintiffs argued that the bank "conducted its overdraft practices . . . in an allegedly misleading and deceptive manner, and that they should accordingly be held liable for such conduct." *Id.* As a result, the court determined that the claims "merely touch on TD's disclosures," which "is not enough for preemption." *Id.* This Court also has determined that the NBA does not "preempt state law insofar as the latter only creates liability for intentional and affirmative misrepresentations." *Murr v. Cap. One Bank (USA), N.A.*, 28 F. Supp. 3d 575, 583 (E.D. Va. 2014). The court noted that the parties agreed "that omission claims are preempted but misrepresentation claims are not" and disregarded the bank defendant's argument that "holding it liable for fraud under Virginia common law is tantamount to imposing greater disclosure requirements." *Id.*

27

Here, Plaintiffs' claims do not require Defendants to make specific disclosures, but rather "attack the allegedly unlawful manner" in which Defendants acted. *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d at 1313. To be sure, Plaintiffs allege that Defendants "[f]urtively created . . . the similarly named '360 Performance Savings' account," "[c]oncealed that the 360 Performance Savings account was not Capital One's only online savings account, and that the 360 Savings account continued to exist with a much lower rate" and "[f]ailed to correct representations that the 360 Savings online savings account was Capital One's 'high interest' savings account." (*See, e.g.*, CAC ¶ 150(a)–(c).) Implicit in this alleged conduct stands a claim that Defendants failed to disclose the new 360 Performance Savings account, or the distinctions between the two accounts, to existing 360 Savings accountholders. Nevertheless, Plaintiffs' generally applicable state law claims "rest[] on an activity other than requiring certain disclosures" and, rather than require specific disclosures, the claims "insist that [b]anks operate free from fraud and other deceptive business practices." *Smith*, 158 F. Supp. 3d at 105. The state laws at issue do not require Defendants to disclose specific information; rather, Plaintiffs' claims challenge Defendants' alleged fraud and deception, including the representation[6] that the 360 Savings account continued to be a "high interest" Capital One savings account and the furtive concealment of the fact that 360 Savings had become an unsupported product following

---

[6]    The Court takes note of its own precedent in *Murr*, in which this Court stated that "omission claims are preempted but misrepresentation claims are not." 28 F. Supp. 3d at 583. The Court, however, also notes that none of Plaintiffs' state law claims specifically require Plaintiffs to prove an "omission," to the exclusion of another fraudulent or deceptive practice, in order to state a claim. *See, e.g.*, N.J.S.A. § 56-8:2 (Count VII, under the New Jersey CFA, can be based on, among other things, "fraud, false pretense, false promise, <u>misrepresentation</u>, or the knowing concealment, suppression, or <u>omission</u> of any material fact." (emphasis added)). Because Plaintiffs allege that Defendants "[f]ailed to correct <u>representations</u> that the 360 Savings online savings account was Capital One's 'high interest' savings account," (*e.g.*, CAC ¶ 278(c) (emphasis added)), the Court finds that Plaintiffs' claims do not run afoul of this Court's acknowledgment in *Murr* that "omission claims are preempted." 28 F. Supp. 3d at 583.

the introduction of 360 Performance Savings.  (*See, e.g.,* CAC ¶¶ 86, 89, 150(c).)  Thus, the challenged conduct is not Defendants' failure to disclose any specific new information, but rather their affirmative efforts taken to keep Plaintiffs in the dark and hide material information pertaining to their preexisting 360 Savings accounts.

As a final note, the Court finds that Plaintiffs' alternatively pled claims for unjust enrichment and promissory estoppel (Counts XXII, XXIII) similarly do not stand preempted. These alternate claims rely on the same underlying allegations as Plaintiffs' contract and statutory claims.  (*See* CAC ¶¶ 303, 307 ("Plaintiffs re-allege and incorporate all other factual allegations set forth in this Complaint.").)  In their unjust enrichment claim (Count XXII), Plaintiffs allege that Defendants "unjustly profited" by knowingly paying Plaintiffs less interest as a result of the allegedly deceptive conduct.  (*Id.* ¶ 304.)  As one court noted, federal law does not preempt unjust enrichment claims that are "not addressed at [national banks] being 'enriched' by Plaintiffs, but at [banks] being '*unjustly* enriched.'"  *Williams v. Wells Fargo Bank N.A.*, 2011 WL 4901346, at *10 (S.D. Fla. Oct. 14, 2011) (emphasis in original).  An unjust enrichment claim "does not seek to impose requirements on [the bank's] conduct; it simply seeks the return of funds unjustly paid."  *Id.*  Here, the CAC alleges that Defendants acted deceptively, fraudulently, in bad faith and unjustly, and as the Court already addressed, the state laws at issue do not seek to impose mandatory disclosures or "requirements on [the bank's] conduct."  *Id.*

Similarly, Plaintiffs' promissory estoppel claim alleges that Defendants' furtive and deceptive behavior "induce[d] customers" to maintain funds in the lower-paying 360 Savings account.  (CAC ¶¶ 308–09.)  This claim also aligns with Plaintiffs' generally applicable state statutory claims, which challenge Defendants' allegedly deceptive and unfair behavior, including the alleged concealment of the 360 Savings accounts as unsupported "legacy" accounts with a

frozen, low interest rate.  (*See, e.g., id.* ¶ 103 (after speaking with a representative, Plaintiff Molloy discovered that 360 Savings accounts were "legacy" accounts that Capital One "was no longer updating").)  Because the promissory estoppel claim also can be said to "attack the allegedly unlawful manner" in which Defendants acted, the Court finds that federal law does not preempt Count XXIII.  *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d at 1313.[7]

In sum, to the extent that the CAC seeks the imposition of a specific, mandatory interest rate, Plaintiffs' claims would qualify as preempted.[8]  However, because the Court determines that Plaintiffs' claims seek to impose a legal duty on Defendants to avoid deception and concealment in their dealings with customers and when setting interest rates on savings accounts, Plaintiffs' state law claims do not "significantly interfere" with CONA's federal power to receive deposits.  Therefore, the Court will DENY Defendants' Motion to the extent that it moves the Court to dismiss Plaintiffs' claims on preemption grounds.

**B.      Whether Plaintiffs State a Plausible Claim Against COFC**

Defendants next argue that Plaintiffs have not stated a plausible claim against COFC. Specifically, Defendants contend that the action arises out of Plaintiffs' contract with CONA only, and that the CAC lacks well-pleaded facts showing any allegedly unlawful conduct by COFC. (Mem. at 26.)  Defendants further argue that Plaintiffs' allegations are asserted in a "group" or "shotgun" style pleading, leaving no facts sufficient to state a claim against COFC.

---

[7]      At this point in its analysis, the Court merely holds that none of Plaintiffs' claims stand preempted.  Defendants' arguments that Plaintiffs fail to state claims for unjust enrichment and promissory estoppel will be addressed separately below.  (Mem. at 62–66.)

[8]      The Court adds that Plaintiffs' Prayer for Relief in the CAC asks the Court to "[d]eclare Defendants' conduct unlawful," "[e]njoin Defendants from the unlawful conduct alleged herein" and "[a]ward . . . damages . . . restitution and/or disgorgement."  (CAC ¶¶ 312–18.)  Nowhere in the Prayer for Relief do Plaintiffs request the imposition of a desired or mandatory interest rate. To the extent that Defendants assert that the Court cannot order a mandatory interest rate, (Mem. at 30–31), the Court agrees; however, Plaintiffs do not stand preempted from seeking appropriate relief for Defendants' alleged fraudulent, deceptive or unlawful conduct.

(*Id.* (citing *Marriott Int'l, Inc. v. Dynasty Mktg. Grp., LLC*, 2022 WL 20699258, at *4 n.12 (E.D. Va. Sept. 21, 2022)).)  Because Plaintiffs' claims sound in fraud, Defendants argue that Plaintiffs must clearly allege which of COFC and CONA made the allegedly fraudulent statements at issue.  (*Id.* at 26–27 (citing *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 280 (4th Cir. 2014)).)

As an initial matter, the Court notes that Plaintiffs assert that they "seek to hold COFC directly liable for conduct and omissions on the Capital One online banking website, which COFC owns and operates jointly with CONA."  (Opp. at 40 (citing CAC ¶ 53).)  Accordingly, because Plaintiffs state that they do not seek to hold COFC liable through its corporate relationship with CONA, the Court will not address Defendants' arguments pertaining to "unity of interest" or "piercing the corporate veil."  (Mem. at 27.)

The Court will address whether Plaintiffs have satisfied the heightened pleading standard for claims sounding in fraud in a subsequent section.  *See infra* Section III.D.1.b.  Nevertheless, for the purposes of analyzing whether Plaintiffs have stated a plausible claim against COFC, the Court acknowledges that Federal Rule of Civil Procedure 9(b) requires Plaintiffs to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  Fourth Circuit precedent further specifies that claims sounding in fraud must "allege the who, what, when, where and how" of the alleged fraud.  *Ahumada*, 756 F.3d at 280.  This particularity requirement includes identifying "the identity of the person making [an alleged] misrepresentation."  *Id.* (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008)).

Thus, fraud claims must avoid "shotgun pleading," where a plaintiff "presents many different transactions, occurrences and series of transactions and occurrences . . . in such a

conclusory form that it is virtually impossible to ascertain what claims are asserted against which defendants and on what legal basis." *Turton v. Va. Dept. of Educ.*, 2014 WL 12539403, at *2 (E.D. Va. Sept. 23, 2014); *see also SunTrust Mortg., Inc. v. First Residential Mortg. Servs. Corp.*, 2012 WL 7062086, at *7 (E.D. Va. Sept. 11, 2012) ("Shotgun pleading occurs when a complaint fails to articulate claims with sufficient clarity to allow the defendant to frame a responsive pleading.") (internal quotation omitted); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) (stating that a plaintiff "cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group").

"Nevertheless, courts have been hesitant to dismiss complaints as a whole under Rule 8 where there is an allegation of group liability under each claim." *Marriott Int'l, Inc.*, 2022 WL 20699258, at *4 n.12. For example, in *Robinson v. Moynihan*, 2021 WL 2346107 (E.D. Va. June 8, 2021), this Court opted to "analyze[] each count" rather than dismiss a "shotgun pleading." *Id.* at *3. Then in *Mao v. Global Trust Management, LLC*, 2022 WL989012 (E.D. Va. Mar. 31, 2022), this Court determined that plaintiffs' claims did not constitute "shotgun pleading," because they "articulate[d] a theory of group liability under each claim." *Id.* at *3.

The Court determines that Plaintiffs have adequately stated a claim against COFC. First, Plaintiffs clearly delineate COFC's involvement in the alleged conduct. The CAC states that CONA and COFC jointly operate Capital One's website. (CAC ¶ 53.) Plaintiffs further allege that the website's "terms and conditions" state that the "information contained on the Site . . . are copyright ©2022 by [COFC]" and that COFC "advertises and promotes Capital One online savings accounts via the Capital One website." (*Id.*) In alleging that deposits with CONA allow COFC to lend money, the CAC also cites COFC's 2022 Form 10-K, which states that "[COFC's] consolidated total net revenues are derived primarily from lending to consumer and commercial

32

customers net of funding costs associated with our deposits." (*Id.*) Separately, the CAC alleges that CONA drafted the 360 Disclosures, which provided the applicable terms for Plaintiffs' 360 Savings accounts and allowed CONA to vary interest rates at its discretion. (*Id.* ¶¶ 5, 58–60.) Thus, the CAC makes clear the distinct roles of each Defendant: COFC jointly operated Capital One's website, where it promoted Capital One savings products, including the 360 Savings account and the 360 Performance Savings account, while CONA also jointly operated the website and bore responsibility for drafting and enforcing the terms of the 360 Disclosures, which applied to 360 Savings accounts. To the extent required at the motion-to-dismiss stage, Plaintiffs thus sufficiently "allege the who" of the alleged fraud. *Ahumada*, 756 F.3d at 280.

Further, the CAC does not present the typical issues of "shotgun pleading." *See Robinson*, 2021 WL 2346107, at \*2–3 (noting that the complaint was "unclear as to which counts Robinson allege[d] against each defendant" and pled "numerous unintelligible theories of recovery"). Here, the CAC clearly articulates which claims are pled against which Defendant, with Count I against CONA only, Counts II and XII against COFC only and the remaining claims against both Defendants. (*See, e.g.*, CAC ¶¶ 132, 138, 145.) This matter does not stand as a case where "a complaint fails to articulate claims with sufficient clarity to allow the defendant[s] to frame a responsive pleading," as demonstrated by Defendants' ability to file both the instant Motion and an Answer (ECF No. 33). *SunTrust Mortg., Inc.*, 2012 WL 7062086, at \*7. Nor do Plaintiffs' claims, based on generally applicable state common law and statutory schemes, present "unintelligible theories of recovery" that appear "virtually impossible to ascertain." *Robinson*, 2021 WL 2346107, at \*3; *Turton*, 2014 WL 12539403, at \*2.

Even if the CAC did constitute "shotgun pleading," the Court would follow its own direction to avoid dismissing a complaint on that basis alone and instead "resolve disputes on the

merits when possible." *Oliverio v. Va. Commonwealth Univ.*, 2023 WL 4110062, at *4 (E.D. Va. June 21, 2023). Further, this Court has previously "been hesitant to dismiss complaints as a whole . . . when there is an allegation of group liability under each claim." *Marriott Int'l Inc.*, 2022 WL 20699258, at *4 n.12 (first citing *Mao*, 2022 WL 989012, at *3; and then citing *Robinson*, 2021 WL 2346107, at *3). Here, Plaintiffs seek to hold COFC directly liable for its joint operation of Capital One's website, where COFC advertised and promoted Capital One's savings products and earned revenue from CONA's maintenance of those accounts. (CAC ¶ 53.) Aside from Counts I, II and XII, Plaintiffs' claims allege joint "group liability" against both CONA and COFC for the underlying alleged conduct. At this stage in the litigation, "Plaintiffs cannot be expected to know the exact . . . degree of each Defendant's involvement . . . prior to discovery." *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *9 (D.N.J. May 8, 2017). Discovery should allow Plaintiffs to better assess the degree of each Defendant's involvement in the alleged underlying conduct. "Moreover, this Court is satisfied that, with the limited information in Plaintiffs' possession, Plaintiffs have made specific allegations" as to COFC, namely its joint role in operating the Capital One website and promoting the savings products maintained by CONA. *Id.* at *10.

For the foregoing reasons, the Court will DENY Defendants' Motion to the extent that it asserts that Plaintiffs fail to state a plausible claim against COFC.

### C.    Count I: Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendants next argue that Plaintiffs have not stated a claim for breach of the implied covenant of good faith and fair dealing and therefore Count I, raised only against CONA, should be dismissed. (Mem. at 38–44.) Specifically, Defendants assert that the contract provides CONA the express right to vary interest rates and annual percentage yields at any time at

34

CONA's discretion. (Mem. at 40 (citing CAC ¶¶ 7, 72).) Accordingly, Defendants contend that, under Virginia law, the implied covenant cannot override such express contractual rights. (*Id.*) Alternatively, even if the contractual right were subject to the implied covenant, Defendants argue that CONA has not acted dishonestly or in bad faith. (Mem. at 43–44.) Plaintiffs counter by asserting that the implied covenant applies to CONA's exercise of "discretion" in varying interest rates under the 360 Disclosures. (Opp. at 30–34.) Further, Plaintiffs assert that CONA's alleged conduct qualifies as "dishonest" and therefore constitutes a breach of the implied covenant. (*Id.* at 34–40.)

The Court begins by noting that Plaintiffs challenge Defendants' argument that the 360 Disclosures are incorporated by reference in the CAC. (*Id.* at 30 n.12.) Plaintiffs state that "CONA attaches [to its Memorandum in Support of this Motion] only what is apparently the most recent version of the document, effective June 5, 2024—long after this lawsuit was filed." (*Id.* (citing ECF No. 30-1).) However, as Defendants note, Plaintiffs explicitly cite in the CAC the most recent version of the 360 Disclosures, accessed on July 1, 2024 — the date that Plaintiffs filed the CAC. (Reply at 18 n.4 (citing CAC ¶ 58 n.15).) Nowhere in the CAC or in their Opposition do Plaintiffs contend that an earlier version of the 360 Disclosures contained different contractual language, particularly pertaining to the provision regarding CONA's discretion to vary interest rates. (*See, e.g.*, Opp. at 30 (citing CAC ¶¶ 58, 60).) Accordingly, for the purpose of analysis in this Motion, the Court considers this recent version of the 360 Disclosures properly incorporated. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (noting that, when ruling on a motion to dismiss, the court may consider "documents incorporated into the complaint by reference").

The parties agree that the 360 Disclosures stand governed by Virginia contract law. (Mem. at 38 ("Virginia law governs Plaintiffs' contract claim."); CAC ¶ 5 ("CONA drafted this agreement and selected Virginia contract law to govern its terms.").)  "Under Virginia law, every contract carries an implied covenant of good faith and fair dealing." *Rogers v. Deane*, 992 F. Supp. 2d 621, 633 (E.D. Va. 2014).  A breach of the implied covenant, however, "only gives rise to a breach of contract claim, not a separate cause of action." *Frank Brunckhorst Co. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 462 (E.D. Va. 2008).  A claim for breach of the implied covenant requires "(1) a contractual relationship between the parties, and (2) a breach of the implied covenant." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009).  Here, the parties do not dispute that a contractual relationship existed between CONA and Plaintiffs under the 360 Disclosures, so the only question is whether Plaintiffs have properly alleged a breach of the implied covenant.

Under Virginia law, the implied covenant of good faith and fair dealing protects a party's right "to receive the benefits of the agreement." *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 611 (4th Cir. 2021) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2021)).  Thus, the implied covenant prohibits a party from exercising "contractual discretion in bad faith, even when such discretion is vested solely in that party." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*, 156 F.3d 535, 542 (4th Cir. 1998) (applying Virginia law in an appeal from the Western District of Virginia).  The implied covenant does not, however, "prevent a party from exercising its explicit contractual rights." *Id.*  Accordingly, under Virginia law, if a party possesses a discretionary power under the contract, "that party cannot act arbitrarily or unfairly" in exercising its discretion. *Stoney Glen, LLC v. S. Bank & Tr. Co.*, 944 F. Supp. 2d 460, 466

36

(E.D. Va. 2013).  But if a party has an express right under the contract, then "that party is only forbidden from acting dishonestly."  *Id.*

Plaintiffs focus on this distinction between express rights and contractual discretion, contending that "CONA attempts to dodge the issue by arguing that its contractual 'discretion' is a contractual right, thus waiving away the distinction."  (Opp. at 31.)  Defendants counter that the mere use of the phrase "at our discretion" does not negate the fact that the provision grants CONA the express right to vary rates "at any time."  (Reply at 20.)

Nevertheless, even assuming that CONA possessed an express right to vary interest rates at any time, as Defendants submit, the Court finds that Plaintiffs plausibly allege that CONA acted dishonestly and thus breached the implied covenant.  *See Stoney Glen, LLC*, 944 F. Supp. 2d at 466 (when a defendant has an express right under the contract, that party is "forbidden from acting dishonestly").  The CAC alleges that CONA created the new, similarly named 360 Performance Savings account on or around September 16, 2019, and that Capital One simultaneously "buried all references to 360 Savings on its website."  (CAC ¶¶ 63–65.)  The CAC includes archived screenshots of the website (1) on September 17, 2019, showing the 360 Savings account as an available option and then (2) on September 18, 2019, showing no reference to 360 Savings but instead advertising the similarly named 360 Performance Savings account.  (*Id.* ¶ 63.)  Since September 2019, the website has only mentioned the 360 Performance Savings account, which is "identical [to the 360 Savings account] except for the interest rate."  (*Id.* ¶¶ 75, 81.)  The Court can reasonably infer that CONA acted dishonestly based on these alleged facts, which, taken as true, suggest that CONA created an account that would reasonably cause confusion and then concealed information that would otherwise lead consumers to discover the distinction between the two savings accounts.

37

The CAC goes on to allege that, since December 2020, the 360 Savings rate has remained frozen at 0.30% APY. (*Id.* ¶¶ 67–69.) The different rates applied to the otherwise identical products became particularly stark beginning in 2022, when 360 Savings remained frozen at 0.30% APY while the 360 Performance Savings rate rose substantially with a corresponding rise in the federal funds rate, and eventually reached as high as 4.3% APY in August 2023. (*Id.* ¶¶ 67–69.) Plaintiffs further allege that Capital One "promoted the 360 Savings account as paying 'High Interest,'" from "at least April 2013 through September 2019" and 360 Performance Savings as paying a "High Yield," two terms that the website acknowledges as meaning the same thing. (*Id.* ¶¶ 61, 74.) In one specific instance, Plaintiffs allege that a Capital One representative told Plaintiff Hans that he could "view rates for all our current 360 product offerings . . . by going to the 'Checking and Savings tab' . . . and selecting 'View and Compare Rates;'" however, that page only showed the 360 Performance Savings rate, with no reference at all to the existing 360 Savings product that Plaintiff Hans continued to maintain. (*Id.* ¶ 95(b).)

The Court finds that Plaintiffs plausibly allege that CONA acted dishonestly by preventing Plaintiffs from identifying that the advertised Capital One "high interest" savings rate no longer applied to their accounts and making an informed decision about where to maintain their savings. An analogy can be drawn to *Marcus v. Dennis*, 2022 WL 1527524 (E.D. Va. May 13, 2022), in which this Court found a breach of the implied covenant when the "alleged behavior far surpassed the arbitrary and creeped waywardly into the dishonest." *Id.* at *5. In that case, the defendant allegedly "took steps to ensure that the [Plaintiffs] remained in the dark about the true cost of the items . . . purchased from vendors," resulting in overpayments. *Id.* Only when "Plaintiffs likely knew the true cost of an item" did the defendant charge the correct price. *Id.* Here, Plaintiffs plausibly allege that Defendants, like the defendant in *Marcus*, kept

them in the dark by burying all references to 360 Savings and replacing that account with the new, similarly named 360 Performance Savings account. (CAC ¶¶ 63–65.) Only when Plaintiffs spoke with a Capital One representative — in some cases years later — did Plaintiffs learn that they would need to open a 360 Performance Savings account to earn Capital One's advertised "high interest" savings rate. (*See, e.g.*, *id.* ¶ 106 (In March 2023, Plaintiff Perger "was told that he needed to open 360 Performance Savings accounts to receive Capital One's advertised interest rate").)

In *Enomoto*, this Court also found a breach of the implied covenant of good faith and fair dealing based on allegations of dishonest conduct. 624 F. Supp. 2d at 450–51. In that case, the plaintiff alleged that the defendant "purposefully failed to provide him with a space flight and purposefully failed to inform him of the high likelihood of medical disqualification until after he had paid three or four payments." *Id.* at 451. This Court determined that the allegations did not merely claim that the defendant engaged in an "unfavorable exercise of its contractual rights," but rather that its conduct constituted "bad faith and unfair dealing" through dishonesty. *Id.* So too, here, do Plaintiff's allegations plausibly plead that CONA acted dishonestly to "take advantage of customers" and "profit[] from paying less interest to [360 Savings] accountholders" who were prevented from identifying the distinction between accounts. (CAC ¶¶ 73, 77.)

Defendants note that all necessary information to compare rates was available to Plaintiffs by comparing their account statements, which listed the applicable 360 Savings APY, and the website, which listed the 360 Performance Savings account and its corresponding APY. (Mem. at 43–44 (citing CAC ¶¶ 63–64, 69 n.23, 77).) Nevertheless, CONA's creation of the similar sounding 360 Performance Savings account and the replacement and removal of any reference to 360 Savings on the website made such comparison virtually impossible without

unreasonable efforts, since the website text reasonably misled Plaintiffs into believing that the posted rate continued to apply to their accounts, even though it no longer did.  (CAC ¶¶ 63–66); *see infra* Section III.D.1.e.  Further, a provision granting CONA authority to vary interest rates "at any time" does not equate to unfettered power to hold the 360 Savings rate constantly low while varying the rate of the otherwise identical "high yield" 360 Performance Savings account during that same period.  This alleged behavior is sufficiently dishonest to support Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

Accordingly, because the Court can reasonably infer dishonesty from Plaintiffs' allegations regarding Defendants' underlying conduct, the Court does not need to settle the parties' disagreement as to whether the interest rate provision conveyed a discretionary power or an express right.  *See Stoney Glen, LLC*, 944 F. Supp. 2d at 466 (noting that even if a party has an express contractual right, the party is "forbidden from acting dishonestly").  The Court, therefore, finds that Plaintiffs have sufficiently pled a claim for breach of the implied covenant of good faith and fair dealing and will DENY Defendants' Motion to the extent that it moves to dismiss Count I for failure to state a claim.

### D.      Counts II through XXI:  State Statutory Claims

The Court next turns to the state statutory claims raised in Counts II through XXI.  In doing so, the Court first addresses the challenges raised by Defendants against all or several of Plaintiffs' statutory claims, before turning to examination of each individual claim.

#### 1.      Challenges Against All or Multiple Claims

##### a.      Choice of Law

Defendants assert that Plaintiffs' relationship with Capital One is governed by Virginia law, requiring dismissal of all claims brought under the laws of other states.  (Mem. at 45.)

Defendants rely on the 360 Disclosures' choice-of-law provision, which includes the following language under the heading "Governing law and regulations": "Your accounts are subject to both federal law and the laws of the state of Virginia, as well as any operating circulars or clearing house rules that apply to us and the rules and regulations of our supervisory authorities." (ECF No. 30-1 at 13.)  Plaintiffs counter that this choice-of-law provision does not bar their statutory claims brought pursuant to the laws of other states, because (1) COFC is not a party to the 360 Disclosures and (2) the provision should not be construed as a waiver of other state laws.[9]  (Opp. at 42–43.)

"Virginia law looks favorably upon choice of law clauses in a contract." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999).  "In Virginia, courts considering contract-related claims will give a choice-of-law provision in a contract the fullest effect intended by the parties absent unusual circumstances." *Self Insured Servs. Co. v. Panel Sys., Inc.*, 352 F. Supp. 3d 540, 551 (E.D. Va. 2018) (citing *Hitachi Credit Am. Corp.*, 166 F.3d at 624)).  As this Court recently noted, choice of law, which "relates to the substantive law that applies to a dispute, regardless of where that case is heard," stands as a distinct issue from choice of forum, which establishes "where a case may be heard in light of the relevant governing principles and precedent." *BDO USA P.C. v. Crandell*, 2024 WL 3740751, at *2 (E.D. Va. Apr.

---

[9]  As addressed in the previous section, the parties dispute whether the version of the 360 Disclosures attached by Defendants to their Memorandum in Support of the instant Motion should be considered incorporated into the CAC.  (Opp. at 30 n.18; Reply at 18 n.4.)  As discussed above, for the purposes of this Motion, the Court considers the June 5, 2024 version of the 360 Disclosures, with the cited choice-of-law provision, incorporated.  Defendants further assert that "all versions of the [360 Disclosures] during the relevant time period contained the language on which Capital One relies in this motion." (Reply at 18 n.4.)  Because the Court resolves the ambiguity of the choice-of-law provision in Plaintiffs' favor, and because Defendants do not contend that an earlier version of the 360 Disclosures contained clearer language supporting its interpretation of the choice-of-law provision, the Court need not consider an earlier version of the Disclosures for purposes of resolving this Motion.

11, 2024).  "A federal court exercising diversity jurisdiction must apply the choice of law rules

of the forum state."  *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 392

(E.D. Va. 2020).

Here, the 360 Disclosures "unambiguously refer[] to Virginia law and there are no unique

circumstances not to apply the clause's choice-of-law provision."  *Id.*  The parties do not dispute

that Count I, Plaintiffs' claim for breach of contract and the implied covenant of good faith and

fair dealing, and Count II, under the Virginia Consumer Protection Act, stand subject to Virginia

substantive law.  However, Defendants contend that the choice-of-law provision requires

Virginia substantive law to apply to all claims raised by Plaintiffs, precluding Defendants' claims

brought under the laws of any other states (Counts III–XXI).  (Mem. at 45.)  In contrast,

Plaintiffs posit that the provision does not operate as a waiver of their claims under other state

statutes.  (Opp. at 43.)

The central question for the Court to consider here is whether, under the 360 Disclosures'

choice-of-law provision, Virginia's conflicts-of-law rules apply.  If yes, then Plaintiffs can assert

Counts III–XXI under the various statutes of other states, because they were harmed by the

alleged conduct in their respective states of residence.  *See Quillen v. Int'l Playtex, Inc.*, 789 F.2d

1041, 1044 (4th Cir. 1986) (citing *McMillan v. McMillan*, 253 S.E.2d 662, 663 (Va. 1979))

("[T]he Virginia Supreme Court has consistently held that it is the place of the wrong (lex loci

delicti) that determines which State's substantive law applies in a tort action brought in

Virginia.").  However, if the 360 Disclosures' choice-of-law provision prohibits application of

Virginia's conflicts-of-law rules, then only Virginia substantive law applies and Plaintiffs'

claims under the laws of other states would be subject to dismissal.  *See Freedman v. Am.

Online, Inc.*, 325 F. Supp. 2d 638, 653 (E.D. Va. 2004) (applying Virginia substantive law,

because the contractual provision expressly excluded Virginia's conflicts-of-law rules). Comparison of the contested choice-of-law provision in this case to those in the cases cited by the parties proves instructive.

Defendants cite *Run Them Sweet, LLC v. CPA Global Limited*, 224 F. Supp. 3d 462 (E.D. Va. 2016), in which this Court dismissed California tort and unjust enrichment claims, because "the text of the choice-of-law provision point[ed] persuasively to the conclusion that the parties intended that Virginia law apply to tort and unjust enrichment claims related to the Agreement." *Id.* at 467. The provision at issue in *Run Them Sweet*, which was titled "Governing Law," not only provided that the "conditions and any contract made under them shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia," but also included a forum selection clause requiring any suit to be "brought in a U.S. District Court located in the Commonwealth of Virginia." *Id.* at 464. Thus, this Court determined that the chosen language "counsel[ed] in favor of a broad interpretation," because combining the choice of law and forum selection issues within a single provision "manifests the intent to reduce uncertainty and proceed in one forum under one body of law." *Id.* at 467 (quoting *Zaklit v. Glob. Linguist Sols., LLC*, 2014 WL 3109804, at *11 (E.D. Va. July 8, 2014)).

By contrast, Plaintiffs cite *In re Capital One Consumer Data Security Breach Litigation* ("*Security Breach Litigation*"), in which this Court held that the applicable choice-of-law provision did not preclude plaintiffs from asserting claims under the substantive law of other states. 488 F. Supp. 3d at 392–93. The provision at issue in that case was titled "The Law That Applies to Your Agreement," and stated that the "Agreement is governed by applicable federal law and by Virginia law." *Id.* at 391–92. Noting that courts "must give effect to the words used (and not used)" in a contract, this Court found "no language in the Cardholder Agreement that

can be reasonably construed to exclude the application of Virginia's choice of law rules." *Id.* at 392. The Court distinguished the choice-of-law provision from the one in *Run Them Sweet*, noting that the *Run Them Sweet* provision included a forum selection clause, was titled "Governing Law" and expressly designated resolution of any dispute to take place in a federal court located in Virginia. *Id.* at 393 n.8 (citing *Run Them Sweet*, 224 F. Supp. 3d at 467). The court also cited this Court's decision in *Freedman*, which determined that Virginia substantive law applied under the contract at issue, because the choice-of-law provision specifically stated that "the laws of the Commonwealth of Virginia, excluding the conflicts-of-law rules, govern this Agreement and your membership." *Id.* at 392 (citing *Freedman*, 325 F. Supp. 2d at 653).

Comparing the instant choice-of-law provision to the two examined in this Court's recent decisions in *Run Them Sweet* and *Security Breach Litigation*, the Court finds that the analysis supports Plaintiffs' position. Defendants correctly note that, like the provision in *Run Them Sweet*, the provision at issue in this case is titled "Governing Law." (Reply at 28 (citing *Run Them Sweet*, 224 F. Supp. 3d at 468).) Defendants also accurately note that the provision in the 360 Disclosures states that Plaintiffs' "accounts are subject to" Virginia law, which implies a broader application than the provision in *Security Breach Litigation*, which stated only that the "agreement" stood governed by Virginia law. (*Id.* at 28–29 (citing *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 391–92).)

However, in citing *Run Them Sweet*, Defendants fail to address the fact that the provision in that case also expressly designated resolution of any dispute to take place in a federal court located in Virginia. 224 F. Supp. 3d at 464. "Contracting parties express their intention 'in the words they have used,' and as such, courts must examine those words to ascertain the parties' intent." *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 392 (quoting *W.F.*

44

*Magann Corp. v. Virginia-Carolina Elec. Works, Inc.*, 123 S.E.2d 377, 381 (Va. 1962)).  The

Court "must give effect to the words used (and not used)" in the 360 Disclosures.  *Id.*  No

language, either in the choice-of-law provision or elsewhere in the 360 Disclosures, establishes a

forum selection clause.  Thus, despite the "Governing Law" label, the Court does not find that

the choice-of-law provision here "counsel[s] in favor of a broad interpretation" or "manifests the

intent to  . . . proceed in one forum under one body of law."  *Run Them Sweet*, 224 F. Supp. 3d

at 467.

 In addition, no language in the 360 Disclosures choice-of-law provision "exclude[s] the

application of Virginia's choice of law rules, which are part and parcel of that governing Virginia

law."  *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 392.  The Court

further notes that the 360 Disclosures contain a separate "Wire Transfer Disclosure Statement."

(ECF No. 30-1 at 20.)  That separate section also includes a "Governing law" section with the

following language:  "The Wire Transfer Service and these terms and conditions shall be

governed by the internal laws of the State of Virginia *without regard to its conflicts of rules* and

the laws of the United States."  (*Id.* at 25 (emphasis added).)  Reading "conflicts of rules" as

equivalent to "conflicts-of-law rules," the Court can infer that Capital One knew that it could

have included language explicitly excluding Virginia's conflicts-of-law rules in the 360

Disclosures, yet chose not to do so.  *See Freedman*, 325 F. Supp. 2d at 653 (applying Virginia

substantive law because the choice-of-law provision specifically stated that "the laws of the

Commonwealth of Virginia, excluding the conflicts-of-law rules, govern").

 It would be irrational for Capital One to include more restrictive, limiting language in the

separate Wire Transfer Disclosure Statement but then exclude such language from the 360

Disclosures if it had intended for only Virginia substantive law to apply to the Disclosures.  Once

again, the Court "must give effect to the words used (and not used)" in the 360 Disclosures.  *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 392.  Because the choice-of-law provision does not use any language to indicate that only substantive Virginia law should apply or that Virginia's conflicts-of-law rules should be explicitly excluded — when the separate Wire Transfer Disclosure Statement includes such limiting language — the Court finds that Virginia's conflicts-of-law rules apply to Plaintiffs' claims.

As noted above, under Virginia's conflicts-of-law rules, "it is the place of the wrong (lex loci delicti) that determines which State's substantive law applies in a tort action brought in Virginia."[10]  *Quillen*, 789 F.2d 1044.  The "place of the wrong" identifies the place where "the last event necessary to make an act liable for an alleged tort takes place."  *Id.* (quoting *Miller v. Holiday Inns, Inc.*, 436 F.Supp. 460, 462 (E.D. Va. 1977)).  Accordingly, at the motion-to-dismiss stage, taking Plaintiffs allegations as true, the Court determines that the individual Plaintiffs were injured in their states of residence, where they maintained their 360 Savings accounts and accessed the Capital One website, and that therefore the substantive law of their states of residence governs their respective claims.  *See In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.*, 2013 WL 1827740, at *7 (D.S.C. Apr. 30, 2013) (applying Virginia's "place of the wrong" doctrine to a claim under the New Jersey CFA (Count

---

[10]      In *Insteel Industries, Inc. v. Costanza Contracting Co., Inc.*, 276 F. Supp. 2d 479 (E.D. Va. 2003), while conducting a choice-of-law analysis, this Court found that the facts giving rise to a claim under the North Carolina UDTPA — one of the state statutes involved in this case (Count XIII) — were "tortious in nature and present[ed] distinct elements from an ordinary contract dispute."  *Id.* at 488.  This Court thus applied the lex loci delicti rule to the North Carolina UDTPA claim and found that that the defendant caused the alleged injury in North Carolina, where the plaintiff detrimentally relied on the alleged unfair or deceptive act.  *Id.*  Similarly, in this case, the Court finds that the allegations of fraud and deception, with Plaintiffs relying to their detriment on Defendants' misrepresentations pertaining to their 360 Savings accounts, give rise to claims sounding in tort.  Therefore, the Court applies the "place of the wrong" rule to the individual Plaintiffs' respective state law claims.

VII) stemming from allegedly fraudulent statements, and determining that plaintiff was harmed in the state where she read and relied on the alleged misrepresentations).

For all these reasons, the Court will DENY Defendants' Motion to the extent that it moves to dismiss all claims brought under the laws of other states on the basis of the 360 Disclosures' choice-of-law provision.[11]

### b.    Heightened Pleading Standard

Defendants also contend that Plaintiffs' state statutory claims, which sound in fraud, fail to satisfy the heightened pleading standard for fraud. (Mem. at 50.)  Under Federal Rule of Civil Procedure 9(b), parties alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* Plaintiffs "must allege the who, what, when, where and how of the alleged fraud." *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 280 (4th Cir. 2014). As the Fourth Circuit held in the context of fraud under the False Claims Act, plaintiffs alleging fraud must "at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). "Although silence does not constitute fraud in the absence of a duty to disclose . . . [c]oncealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Murr v. Cap. One Bank (USA), N.A.*, 28 F. Supp. 3d 575, 584 (E.D. Va. 2014).

---

[11]    Because the Court determines that the 360 Disclosures' choice-of-law provision does not prevent Plaintiffs' claims from being asserted under the substantive law of other states, it will not address Plaintiffs' separate argument that their claims against COFC do not stand barred, because COFC is not a party to the 360 Disclosures. (Opp. at 42.)

Defendants' focus their arguments on Plaintiffs' "state statutory counts fail[ing] to distinguish between COFC and CONA—pleading only that 'Defendants' or 'Capital One' undertook the allegedly fraudulent content." (Mem. at 50.)  However, as the Court already addressed above, the CAC includes particular allegations about each Defendant's respective role in the alleged conduct:  COFC jointly operated Capital One's website, where it promoted Capital One savings products, including the 360 Savings account and the 360 Performance Savings account, while CONA jointly operated the website and drafted and enforced the terms of the 360 Savings accounts via the 360 Disclosures.  (CAC ¶¶ 5, 53, 58–60.)  As joint operator of the Capital One website, COFC stands jointly responsible for any representations made or actions taken on that website, including the alleged representations about the "high interest" 360 Savings account and the eventual removal of any references to 360 Savings from the site.  (*Id.* ¶¶ 61, 63.) CONA, joint operator of the Capital One website, drafter of the 360 Disclosures and creator of both the 360 Savings and 360 Performance Savings accounts, also stands responsible for representations made on the website and in Plaintiffs' account statements.  (*Id.* ¶¶ 5, 53, 58–60.)

Aside from Counts II and XII, Plaintiffs' state statutory claims allege joint liability against both CONA and COFC for the underlying alleged conduct.  As this Court recently noted in a case involving allegations of fraud, "courts have been hesitant to dismiss complaints . . . where there is an allegation of group liability under each claim." *Marriott Int'l, Inc. v. Dynasty Mktg. Grp. LLC*, 2022 WL 20699258, at *4 n.12 (E.D. Va. Sept. 21, 2022).  In that case, this Court opted to review the sufficiency of the allegations without dismissing claims solely due to group pleading. *Id.* Further, as the Court noted above, at this stage in the litigation, "Plaintiffs cannot be expected to know the exact . . . degree of each Defendant's involvement . . . prior to discovery." *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *9 (D.N.J.

May 8, 2017).  To the extent that allegations are made against both Defendants, the fact that the

"entities are intertwined through a complex corporate structure," with CONA standing as a

"wholly-owned subsidiary" of COFC, supports allowing Plaintiffs an opportunity to more clearly

assess each Defendant's role in the alleged conduct during discovery.  *Id.* at *9; (CAC ¶ 40).

"Moreover, this Court is satisfied that, with the limited information in Plaintiffs'

possession, Plaintiffs have made specific allegations" as to COFC and COFA, namely

identifying COFC's joint role in operating the website and promoting Capital One's savings

products.  *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *10.  While

Plaintiffs use the generic terms "Defendants" or "Capital One" in the CAC, they make

particularized allegations regarding each Defendant's respective role to satisfy the heightened

pleading standard of Rule 9(b) regarding the "who" of the alleged fraud.  *Ahumada*, 756 F.3d at

280.  Accordingly, any asserted "fail[ure] to distinguish between COFC and CONA" in their

statutory claims does not rise to a level warranting dismissal at this stage.  (Mem. at 50.)

As to the "what, when, where, and how of the alleged fraud," the Court also finds that the

CAC identifies these elements with sufficient particularity.  *Ahumada*, 756 F.3d at 280.

Plaintiffs allege that Capital One advertised its 360 Savings account as featuring "high interest"

on its website from at least April 2013 through September 2019.  (CAC ¶ 61.)  For example, the

CAC includes archived screenshots from Capital One's website with the 360 Savings account

labeled "high interest" on April 24, 2013 and July 8, 2016.  (*Id.* ¶ 61.)  The CAC then alleges

that, on or around September 16, 2019, Capital One introduced the new, similarly named 360

Performance Savings account, while removing all references to the 360 Savings account from the

savings account webpage on the website.  (*Id.* ¶ 63.)  The CAC includes archived screenshots of

the website (1) on September 17, 2019 showing the 360 Savings account as an available option

and then (2) on September 18, 2019 showing no reference to 360 Savings but now advertising the 360 Performance Savings account. (*Id.* ¶ 63.) Plaintiffs also allege that on September 18, 2019, the 360 Performance Savings account featured a 1.90% APY, while the 360 Savings account remained at 1.00%. (*Id.* ¶ 64.) The CAC goes on to allege that Capital One "buried all references to 360 Savings on its website" and "was financially motivated" to do so while "profit[ing] from paying less interest to those accountholders than it otherwise would." (*Id.* ¶¶ 65–66.) Since September 2019, the website has only mentioned the 360 Performance Savings account, which is "identical [to the 360 Savings account] except for the interest rate." (*Id.* ¶¶ 75, 81.)

Meanwhile, since December 2020, Plaintiffs allege that the 360 Savings rate has remained frozen at 0.30% APY, while the 360 Performance Savings account has risen as high as 4.30% APY, in line with a corresponding rise in the federal funds rate since 2022. (*Id.* ¶¶ 67–68.) Plaintiffs allege that Defendants "promoted the 360 Savings account as paying 'High Interest,'" and 360 Performance Savings as paying a "High Yield," two terms that the website acknowledges as meaning the same thing. (*Id.* ¶ 74.) Further, Plaintiffs submit that 360 Savings accountholders can only view their APY in small print on their account statements, but otherwise have no way to differentiate between 360 Savings and 360 Performance Savings. (*Id.* ¶ 77.) The CAC further discusses each individual Plaintiff's 360 Savings accounts and their later discovery of the alleged fraud and interactions with Capital One representatives. (*Id.* ¶¶ 84–109.)

Based on these factual allegations, the Court determines that Plaintiffs adequately allege the "what" of the fraud through Defendants' misrepresentation of the nature of 360 Savings as a "high interest" Capital One savings product. Although Defendants did not expressly state that 360 Savings was a "high interest" account following the introduction of the 360 Performance

Savings product in September 2019, the furtive replacement of 360 Savings on the website and the continued advertisement of "high yield" for the confusingly, nearly identically named 360 Performance Savings account amount to plausible allegations of a misrepresentation pertaining to 360 Savings.  Plaintiffs sufficiently allege the "when" through the allegation of the creation of 360 Performance Savings on September 16, 2019, and the removal of any reference to 360 Savings on the website as of September 18, 2019.  Plaintiffs also clearly establish the "where" as the Capital One website.  And Plaintiffs satisfactorily plead the "how" through allegations that Defendants scrubbed all references to 360 Savings on the website, replaced 360 Savings with a similar sounding, otherwise identical "high yield" account and caused reasonable consumers to be confused as to the distinction between the accounts.  Furthermore, the "how" is supported by allegations that Defendants then froze the 360 Savings rate at 0.30% as of December 2020, in contrast to raising the 360 Performance Savings rate with a rise in the federal funds rate in 2022.

Lastly, the Court acknowledges that a plaintiff must also plead "reasonable, detrimental reliance . . . with particularity." *Xia Bi v. McAuliffe*, 927 F.3d 177, 184 (4th Cir. 2019).  While the Court will discuss reliance in further detail below, it determines here that Plaintiffs have sufficiently pled reasonable reliance in maintaining their 360 Savings accounts on the reasonable expectation that their accounts remained Capital One's "high interest" savings product. *See infra* Section III.D.1.f.  Only after certain attentive accountholders uncovered the alleged deceptive conduct and discovered that 360 Performance Savings was actually an entirely different savings account — by contacting Capital One representatives or hearing about the alleged scheme online or in the news — did they learn that 360 Savings no longer was a supported, "high interest" Capital One savings product. (*See, e.g.*, CAC ¶¶ 86, 89, 90, 96.)

The Court finds that these allegations sufficiently allege a particular course of fraudulent conduct against both COFC and CONA.  Hence, the Court will DENY Defendants' Motion to the extent that it asserts that Plaintiffs have failed to meet the heightened pleading standard for claims sounding in fraud.

### c.    Purchase or Lease of Goods or Services

Defendants assert that Plaintiffs' claims under the consumer protection statutes of Virginia (Count II), California (Count III), Texas (Count V), Pennsylvania (Count VIII), Georgia (Count XIV), Missouri (Count XVIII) and Delaware (Count XXI) fail because those statutes only apply to persons who purchase or lease goods or services.  (Mem. at 48 (citing statutes of respective states).)  Specifically, Defendants argue that Plaintiffs made no purchase, because they admit they paid no fees for their accounts.  (*Id.* (citing CAC ¶ 57(b), (c)).)  Defendants cite two cases, one pertaining to the CLRA and one addressing the Texas DTPA, in support of their argument that Plaintiffs fail to establish that they engaged in the required consumer transactions.  *See Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 957 (N.D. Cal. 2009) (dismissing CLRA claim because overdrafts and overdraft fees on checking account did not constitute a "good" or "service"); *Custer v. Wells Fargo Bank, NA*, 2013 WL 1926412, at *8 (W.D. Tex. Apr. 1, 2013) ("The Texas Supreme Court has clearly held that a person who seeks only to borrow money is not a consumer under the DTPA because money is not a good or a service.").  Plaintiffs counter by arguing that, even if their 360 Savings accounts had no fee, the account requires a "purchase," because customers must "part with money and give it to the bank, in order to both obtain the account and to obtain interest on the balance."  (Opp. at 48.)

Plaintiffs also cite a case in which this Court rejected arguments that Capital One customers are not "consumers" under the CLRA or the Texas DTPA.  (Opp. at 47–48 (citing *In*

52

*re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 420–21, 426–27 (E.D. Va. 2020)).)  In that case, this Court noted that while "the CLRA does not expressly list 'loans' or 'credit' as a form of good or service," plaintiffs plausibly alleged coverage under the CLRA because in "receiving such a line of credit, they ostensibly received the services in developing, securing, [and] maintaining that credit line[,] and they sought benefits associated with the use of the credit card."  *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 422.  As to the Texas DTPA, this Court found that the plaintiff's allegations, "read in a light most favorable to her," "raise the plausible inference that, in receiving a credit line from Capital One, she sought to acquire good[s] and services."  *Id.* at 427.  In reaching that decision, this Court noted that, while the Supreme Court of Texas had held that borrowing money does not seek a "service" and therefore cannot form the basis of a DTPA claim, that court had "elsewhere stated that bank customers do not, in every instance, fail to qualify as a 'consumer.'"  *Id.* at 426 (first citing *Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382 (Tex. 1982); and then citing *Flenniken v. Longview Bank & Tr. Co.*, 661 S.W.2d 705 (Tex. 1983)).  Plaintiffs then cite *Hawthorne v. Umpqua Bank*, 2013 WL 5781608, at *10–11 (N.D. Cal. Oct. 25, 2013) to argue that the "CLRA applies to financial accounts that provide services besides simply access to money, such as convenience."  (Opp. at 51.)

Defendants, in their Reply, seek to distinguish *Hawthorne* and *Security Breach Litigation* from this case, arguing that those cases involved credit and debit card services instead of deposit accounts.  (Reply at 33.)  Specifically, Defendants note that credit and debit card services are generally considered covered under the CLRA and UCL, because they offer "convenience services" that go "beyond the provision of a financial account itself."  (*Id.* (quoting *Hawthorne*, 2013 WL 5781608, at *10–11).)  Defendants also cite a case from the Supreme Court of

California, in which that court determined that a "contractual obligation to pay money under a

life insurance policy" did not qualify as a "service" under the CLRA. (*Id.* (citing *Fairbanks v.*

*Super. Ct.*, 205 P.3d 201, 203 (Cal. 2009)).)

However, Defendants cite no case for the specific proposition that a "high interest"

savings account, such as the 360 Savings account, does not qualify as a "good" or "service"

under any of the challenged state statutes. The Court takes note of a case from the New York

Court of Appeals that involved a claim under Section 349(a) of New York General Business

Law.[12] *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d

741 (N.Y. 1995). In that case, the court concluded that the opening of a savings account with the

defendant bank fell within the "consumer-oriented ambit" of the statute. *Id.* at 745. The Court

acknowledges that this case does not pertain to any of the challenged statutes under this specific

argument from Defendants. However, without any other case directly addressing whether the

opening of a savings account constitutes a "purchase of goods or services," *Oswego* serves as

compelling persuasive authority in support of Plaintiffs' argument that the opening of their 360

Savings accounts does indeed qualify as a consumer transaction.

Furthermore, the Court finds that the debit and credit card services discussed in

*Hawthorne* and *Security Breach Litigation* serve as an appropriate analogy for the 360 Savings

account. Unlike a standard checking account, which typically offers no special "convenience

services," the 360 Savings account was specifically sought out by Plaintiffs due to its "high

---

[12]     Although Defendants do not raise this specific argument about the "purchase of goods or
services" against Count VI, the Court notes that "New York courts have also suggested that a
consumer, for § 349 purposes, is one 'who purchase[s] goods and services for personal, family or
household use.'" *Exxonmobil Inter-Am., Inc. v. Adv. Info. Engr. Services, Inc.*, 328 F. Supp. 2d
443, 448 (S.D.N.Y. 2004) (citation omitted). Thus, review of a case brought under this statute is
relevant for the purposes of addressing Defendants' "purchase of goods and services" argument.

interest" characteristic.  *Hawthorne*, 2013 WL 5781608, at *10.  Thus, the 360 Savings account did not just stand as any average bank deposit account in which to park their money, but an account in which Plaintiffs actively relied on the "high interest" service to earn additional income.  As Plaintiffs allege, "[n]o rational person would maintain an identical account that paid materially lower interest" when they opened their accounts in the first place to benefit from 360 Savings' "high interest" nature.  (CAC ¶ 129.)

As Plaintiffs note, the fact that the 360 Disclosures explicitly state that the 360 Savings account "is a consumer account and must be used primarily for personal, family, or household purposes" only serves to further undermine Defendants' argument.  (Opp. at 48 (quoting ECF No. 30-1 at 5).)  This contractual language mirrors language utilized in the applicable statutes. *See, e.g.*, Va. Code Ann. § 59.1-198 (defining "consumer transaction" to include "goods or services to be used primarily for personal, family or household purposes"); 73 Pa. Cons. Stat. § 201-9.2 (providing a cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes"); Cal. Civ. Code § 1761(e) (defining "consumer" as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes"); Ga. Code Ann. § 10-1-392(10) (defining "consumer transactions" to involve the "sale, purchase, lease, or rental of goods [or] services . . . primarily for personal, family, or household purposes").  As a final point, the Court takes notice that the 360 Disclosures themselves explicitly refer to several of CONA's "services" to accountholders, including "Electronic Fund Transfer services," a Mobile Deposit "service" and Automatic Clearing House (ACH) External Transfer transactions.  (CAC ¶ 169.)  Thus, the 360 Disclosures can also be said to directly acknowledge additional consumer services, beyond merely storage of money, provided to accountholders upon opening their 360 Savings accounts.

For the foregoing reasons, the Court is persuaded that Plaintiffs "purchased" the "service" of earning "high interest" when they deposited their money in the 360 Savings account for that specific reason.  As alleged elsewhere in the CAC, had they been aware of the alleged deceptive conduct, Plaintiffs would have moved their money to the 360 Performance Savings account or another bank, because they specifically sought out the service of earning high interest while saving, not simply to have a place to store their money with no added benefit.  (*See, e.g.*, CAC ¶¶ 103 (Plaintiff Molloy "moved almost all of his money to a new 360 Performance Savings account" upon discovery of the alleged deception), 108 (upon discovery of the alleged conduct, Plaintiff Port "quickly began transferring funds away . . . to another bank").)  Accordingly, the Court will DENY Defendants' Motion to the extent that it asserts that Plaintiffs have failed to allege a consumer transaction via the purchase of goods or services under the relevant state statutes.

### d.      Actionable Misrepresentation[13]

Defendants assert that Plaintiffs also fail to plead facts demonstrating an actionable misrepresentation by Capital One.  (Mem. at 51.)  Specifically, Defendants contend that Plaintiffs do not allege that any representation by Capital One that their accounts earned "high interest" was false when Capital One made it; rather, Plaintiffs tacitly admit that their accounts did earn "high interest" when the statement was made.  (*Id.* at 51–52 (citing CAC ¶¶ 74, 101 ("[360 Savings] was a high interest account compared to other accounts available at the time and was advertised as such")).)  Defendants further contend that Plaintiffs do not allege that Capital One promised their accounts would earn a specific "high" rate or that 360 Savings customers

---

[13]      Because the Court previously found that any of Plaintiffs' claims based on alleged omissions would stand preempted, the Court will not address Defendants' separate argument that Plaintiffs allege no actionable omission.  (Mem. at 53–55); *see supra* note 6.

would receive the same specific rate as 360 Performance Savings customers.  (*Id.* at 52.)  Lastly, Defendants argue that Plaintiffs are left with the "bare contention that Capital One described their accounts as 'high' interest."  (*Id.*)  Defendants assert that "high interest" is vague "puffery" and therefore cannot constitute an actionable misrepresentation.  (*Id.* at 52–53.)

Plaintiffs counter that their allegations concern Defendants' concealment of the fact that Capital One had two different online savings accounts and that 360 Savings had become the low interest product between the two.  (Opp. at 49 (citing CAC ¶¶ 3, 65, 73).)  Plaintiffs assert that they do not allege the "high interest" representation was false when made; rather, it was true and important to their decisions to choose the 360 Savings account for their savings, "which made the furtive relegation of 360 Savings to a low-interest account deceptive and unfair."  (*Id.*)  Plaintiffs further argue that, because Capital One defined the term "high interest" on its own website as a descriptive term for a particular savings account, it cannot claim "puffery" regarding a term that it knows "has a particular meaning to consumers."  (*Id.* (citing CAC ¶¶ 47–52).)

The Court will address the statutory claims in more detail below, but for the purpose of addressing Defendants' argument regarding an actionable misrepresentation, the Court begins by noting that the statutes prohibit a wide variety of fraudulent, deceptive or unfair practices and do not necessarily require, as an element of a claim, that Plaintiffs prove that a representation was false when made.  For example, the VCPA (Count II) prohibits, among other practices, "[m]isrepresenting that goods or services have certain . . . characteristics," "[a]dvertising goods or services with intent not to sell them as advertised," and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction").  Va. Code Ann. § 59.1-200(A).  Under New York General Business Law Sections 349 or 350 (Count VI), which prohibit deceptive acts and false advertising, a plaintiff must show "(1)

consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015). Under its definitions of unfair acts or practices, the UTPCPL (Count VIII) lists "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 Pa. Cons. Stat. § 201-2(4)(xxi). And the Delaware CFA (Count XXI) prohibits various acts, including any "deception, fraud . . . or the concealment, suppression, or omission of any material fact." Del. Code Ann. tit. 6, § 2513(a).

This nonexhaustive list of statutory prohibitions demonstrates the weakness of Defendants' contention that Plaintiffs are required to prove an actionable misrepresentation as an element of all of their state statutory claims. Rather, Plaintiffs can allege fraud and deception through a wide range of practices, including concealment, which Plaintiffs assert they do through their allegations of the "furtive relegation of 360 Savings to a low-interest account." (Opp. at 49.) Thus, to the extent that Defendants argue that Plaintiffs are required to specifically allege that the representation of "high interest" for 360 Savings was false when made to plead any of their statutory claims, the Court rejects Defendants' reading of the law.

The above question notwithstanding, the Court finds that Plaintiffs have plausibly alleged an actionable misrepresentation for purposes of their state law claims. While definitions of misrepresentation can vary across the state laws involved in this case, the Court finds sufficient and substantial similarities permitting a single analysis here. The Court uses the VCPA's approach as a representative example. Under the VCPA (Count II), "[c]ommon law standards of what constitutes a misrepresentation of fact govern such an inquiry." *Koschene v. Hutchinson*, 2007 WL 6013037, at *4 (Va. Cir. 2007) (citing *Lambert v. Downtown Garage, Inc.*, 553 S.E.2d 714, 716 (Va. 2001)). Those standards require a plaintiff to prove "[1] a false representation, [2]

of material fact, [3] made intentionally and knowingly, [4] with intent to mislead, [5] reliance by the party misled, and [6] resulting damage." *Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502, 533 (E.D. Va. 2011). "[C]oncealment, whether accomplished by word or conduct, may be the equivalent of a false representation." *Spence v. Griffin*, 372 S.E.2d 595, 599 (Va. 1988); *see also Murr v. Cap. One Bank (USA), N.A.*, 28 F. Supp. 3d 575, 584 (E.D. Va. 2014) ("Although silence does not constitute fraud in the absence of a duty to disclose . . . [c]oncealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud.").

The Court finds that Plaintiffs have satisfactorily pled an actionable misrepresentation through Defendants' underlying alleged conduct. Defendants correctly point out that the "high interest" label applied to 360 Savings was not false when originally made, before creation of the 360 Performance Savings account. (Mem. at 51.) However, Defendants' alleged conduct — removing all references to 360 Savings and furtively replacing those references with the nearly identically named 360 Performance Savings as of September 18, 2019 — left Plaintiffs unable to identify that the advertised "high yield" product and corresponding interest rate applied to an entirely new Capital One savings account, rather than their existing accounts. (CAC ¶ 65 ("Capital One . . . concealed that 360 Performance Savings was in fact a different product, and not just a new name for the existing 360 Savings product.").)

Plaintiffs' allegations support an inference that Defendants knew that Plaintiffs were "acting upon the assumption" that their 360 Savings accounts had not been relegated to a lower interest rate and replaced as Capital One's advertised, "high interest" savings account. *Murr*, 28 F. Supp. 3d at 584. This concealment of the nature of their savings account stands material to Plaintiffs, because, as they allege in the CAC, "no rational person would maintain an identical

account that paid materially lower interest absent Defendants' wrongful conduct." (CAC ¶ 129.)

Defendants' intent to mislead is sufficiently alleged, as Plaintiffs state that "Capital One was

financially motivated to not inform 360 Savings accountholders that the new 360 Performance

Savings account was available" and thus "profit[ed] from paying less interest to [360 Savings]

accountholders than it otherwise would." (*Id.* ¶ 66); *Nationwide Mut. Ins. Co.*, 785 F. Supp. 2d

at 533. Lastly, as discussed in greater detail below, Plaintiffs sufficiently allege reliance and

damage resulting from Defendants' alleged concealment, as Plaintiffs "relied on Defendants'

conduct" to maintain their 360 Savings accounts, when "[n]o rational person" would do so, and

"los[t] out on interest payments proportionate to their account balances since September 2019"

as a result. (CAC ¶¶ 79, 129); *see infra* Section III.D.1.f–g.

  To be clear, the Court does not find that Defendants needed to specifically inform

Plaintiffs about the new 360 Performance Savings account. As Defendants rightly argue, they

had no legal or contractual duty to disclose the creation of a new account. (Mem. at 53–54.)

However, the allegations in this case do not involve an instance in which Defendants simply

omitted information that they had no duty to disclose. Rather, Plaintiffs allege a complex

scheme in which Defendants furtively replaced 360 Savings with 360 Performance Savings, a

nearly identically named product with otherwise identical features and Disclosures, and then paid

vastly divergent interest rates based on accountholder status. On September 17, 2019, Capital

One's website showed the 360 Savings account as an online savings product; by the next day,

September 18, 2019, any reference to 360 Savings had been quietly replaced with 360

Performance Savings without further explanation. (CAC ¶ 63.) Due to the furtive swap of

products and the removal of all references to 360 Savings, as far as Plaintiffs could tell, the

advertised rate and "high yield" label on the website continued to apply to their preexisting

Capital One savings product under a new name. (*Id.* ¶ 65.) Thus, this overall scheme kept

Plaintiffs in the dark and amounted to a material misrepresentation as to the "high interest"

nature of their 360 Savings account. The allegations boil down not to an omission of

information which Defendants had no duty to disclose, but rather an active course of

concealment to hide the truth from Plaintiffs. Whether Plaintiffs can actually *prove*

misrepresentation, as it pertains to any of their claims, remains to be seen. For the sake of this

Motion, and viewing the facts in the light most favorable to Plaintiffs, the Court finds, however,

that Plaintiffs have adequately *pled* actionable misrepresentation.

Furthermore, to the extent that Plaintiffs' allegations are based on misrepresentations

concerning the "high interest" nature of their 360 Savings accounts, the Court disagrees with

Defendants' characterization of the term "high interest" as nonactionable puffery. (Mem. at 52–

53.) Defendants cite a variety of cases for the proposition that "[p]uffery . . . because of its

vagueness and unreliability[] is immunized from regulation." *Airborne Health, Inc. v. Squid*

*Soap, LP*, 2010 WL 2836391, at *8 (Del. Ch. July 20, 2010); (Mem. at 52–53, 52 n.21). In *Tate*

*v. Colony House Builders, Inc.*, 508 S.E.2d 597 (Va. 1999), the Supreme Court of Virginia held

that statements describing a house as "competently designed" with construction "of the highest

quality" constituted "puffing or opinion and cannot form the basis for an action for constructive

fraud." *Id.* at 600. In *Henning v. Kyle*, 56 S.E.2d 67 (Va. 1949), the same court determined that

statements that a "house was in good condition" and was "an exceptionally good value for the

money" constituted "expressions of opinion" and puffery. *Id.* at 69–70. Defendant also cites

cases in which "vague promises of cost savings and competitive rates," "a general statement that

a company's product is the best," and "describing a product as 'quality' or as having 'high

performance criteria'" constituted nonactionable puffery. *Landau v. Viridian Energy PA LLC*,

223 F. Supp. 3d 401, 416 (E.D. Pa. 2016); *Truck Ins. Exch. v. D'Orazio*, 2021 WL 1206557, at
*9 (Ill. App. Ct. Mar. 30, 2021).

The Court finds these cases, and the puffery language identified within, obviously
distinguishable from the "high interest" label in this case. Defendants identify no case that
directly states that the term "high interest" constitutes nonactionable puffery. Further, within the
context of the Capital One website and its advertising for its online savings products, Defendants
assign a clear meaning to the term "high interest." Review of the current 360 Performance
Savings webpage reveals that the savings account is labeled with the synonymous "high-yield"
term and advertises a specific "4.00% APY." *360 Performance Savings*, Capital One,
https://www.capitalone.com/bank/savings-accounts/online-performance-savings-account/
(accessed November 1, 2024). As alleged in the CAC, the Capital One website also defines
"high-yield" and "high-interest" as meaning the same thing, with savings accounts with these
labels "often [earning] a higher interest rate or [APY] than a traditional savings account." (CAC
¶ 47.) Plaintiffs also allege that the Capital One website states that "[o]nline banks often offer
higher interest rates on savings accounts than traditional banks." (*Id.* ¶ 51.) These allegations
support a finding that Capital One utilizes the "high interest" or "high yield" label to specifically
characterize certain of its online savings products, including 360 Savings and 360 Performance
Savings, in contrast to other traditional deposit accounts that earn low or no interest.

The "high interest" characterization also has a clear, identifiable quantitative component
that undermines Defendants' contention that the term constitutes "vague" puffery or opinion.
Unlike vague statements such as "highest quality," "good value" or "high performance," "high
interest" constitutes a statement that 360 Savings customers can quantitatively assess by logging
into their accounts and viewing the APY that they actually earned. *Tate*, 508 S.E.2d at 600;

*Henning*, 56 S.E.2d at 69; *Truck Ins. Exch.*, 2021 WL 1206557, at \*9. As alleged in the CAC, Plaintiffs relied on the "high interest" characterization when maintaining their money in their 360 Savings accounts. (CAC ¶ 129.) That "high interest" descriptor lost all meaning when the otherwise identical "high yield" 360 Performance Savings account rate received a substantial upwards move — as high as 4.30% in August 2023 — in accordance with changes in market conditions, while the 360 Savings rate remained frozen at 0.30% APY. (*Id.* ¶¶ 67–70.) Relative to the otherwise identical and similar sounding "high yield" 360 Performance Savings account, the 360 Savings account no longer constituted a "high interest" account when Capital One decided to freeze the latter account at a substantially lower rate.

Arguing that the terms "high interest" and "high yield" are vague, nonactionable puffery directly contradicts Defendants' definition and use of those terms on their own website and in their savings product advertisements. Thus, to the extent that any of Plaintiffs' claims rest on allegations that the "high interest" label misled 360 Savings consumers into believing they were earning a higher rate on their savings, the Court finds such a statement actionable.

For all these reasons, the Court will DENY Defendants' Motion to the extent that it argues that Plaintiffs fail to allege actionable misrepresentation.

### e.      Unfair or Deceptive Conduct

Defendants also contend that Plaintiffs fail to allege any conduct constituting unfair or deceptive practices within the definitions of the relevant statutes.[14] (Mem. at 55.) Specifically, Defendants contend that Plaintiffs cannot plausibly allege that any reasonable consumer would be deceived, because Capital One actually disclosed all relevant interest rates. (*Id.*) Defendants assert that Plaintiffs could view the relevant rates on the website and in their account statements

---

[14]      This argument applies to Counts II, III, IV, V, VII, VIII, IX, X, XI, XII, XIII, XV, XVII, XVIII, XIX and XXI.

and that they had the option to open a 360 Performance Savings account or move their money to a different bank at any time. (*Id.* at 55–56.) Plaintiffs counter that a consumer acting reasonably under the circumstances would be deceived by the removal and replacement of any references to 360 Savings with the similarly named, otherwise identical 360 Performance Savings account on the website. (Opp. at 44–47.)

The Court begins by noting that while each state statute might contain unique language to define unfair or deceptive acts or practices, the general requirements qualify as sufficiently similar to allow analysis of this issue across Plaintiffs' statutory claims. *See, e.g.*, Cal. Civ. Code § 1770(a)(5) (Count III) (CLRA lists "[r]epresenting that goods or services have . . . characteristics . . . that they do not have" among unlawful unfair or deceptive practices); Tex. Bus. & Com. Code Ann. § 17.46(b)(5) (Count V) (Texas DTPA includes "representing that goods and services have . . . characteristics . . . which they do not have" in its list of "false, misleading, or deceptive acts or practices"); Md. Code Ann., Com. Law. § 13-301(2)(i) (Count XI) (Maryland CPA includes a "[r]epresentation that: [c]onsumer goods . . . or consumer services have a . . . characteristic . . . which they do not have" in its definition of "unfair, abusive, or deceptive trade practices"); Mich. Comp. Laws § 445.903(1)(c) (Count XVII) (Michigan CPA defines "unfair, unconscionable, or deceptive methods, acts, or practices" to include "representing that goods or services have . . . characteristics . . . that they do not have").

The parties generally agree that the applicable standard for deceptive conduct consists of whether a "reasonable consumer" under the circumstances would likely be misled by the alleged deception. *See Kahn v. Walmart Inc.*, 107 F.4th 585, 598 (7th Cir. 2024) (noting that under the ICFA (Count X), plaintiffs must allege that "the relevant labels are likely to deceive reasonable consumers, which requires a probability that a significant portion of the general consuming

public or of targeted consumers, acting reasonably in the circumstances, could be misled")[15]; *see also Nolan v. Lab'y Corp. of Am. Holdings*, 2024 WL 1554760, at *7–8 (4th Cir. Apr. 10, 2024) (Fourth Circuit applying substantially similar "reasonable consumer" standard to deception claim under FDUTPA (Count XII)). "In general, dismissal for failure to state a claim in this context is appropriate only where it is impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived." *Dawson*, 716 F. Supp. 3d at 956–57.

In its recent decision in *Kahn*, the Seventh Circuit noted that "[w]hen determining reasonable consumer behavior for purposes of consumer protection law, we should consider the behavior of real consumers instead of Adam Smith's *homo economicus* with perfect information." *Id.* at 597. In that case, the Seventh Circuit reversed the district court's dismissal of plaintiff's ICFA claim, which had found "no possibility for deception" where "Walmart provides its customers with a receipt to compare the scanned price with the shelf price." *Id.* at

---

[15]     Plaintiffs cite *Kahn* in support of their argument that a "reasonable consumer" would be deceived by Defendants' alleged conduct. (Opp. at 45–46.) In support of their argument that no "reasonable consumer" would be deceived under the circumstances of this case, Defendants cite several cases involving the state statutes in this case and utilizing a substantially similar "reasonable consumer" standard for deception. (Mem. at 55 nn. 23–24.) *See, e.g., Dawson v. Better Booch, LLC*, 716 F. Supp. 3d 949, 956 (S.D. Cal. Feb. 9, 2024) (under the CLRA (Count III) and UCL (Count IV), "[i]t must be probable that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled"); *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (FDUTPA (Count XII) requires "a showing of probable, not possible deception" that would be "likely to mislead the consumer acting reasonably in the circumstances"); *Tlaib v. Chattem, Inc.*, 691 F. Supp. 3d 851, 856 (N.D. Ill. 2023) (relevant standard under the ICFA (Count X) requires "a probability that a significant portion of the general consuming public or targeted consumers, acting reasonably under the circumstances, could be misled," and "[r]elevant circumstances include all the information available to consumers and the context in which that information is provided and used"); *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (under N.Y. Gen. Bus. Law §§ 349–50 (Count VI), a plaintiff must establish a deceptive act that is "likely to mislead a reasonable consumer acting reasonably under the circumstances"); Mo. Rev. Stat. § 407.025.1(2)(a) (requiring a plaintiff suing under the Missouri Merchandising Purchasing Act (Count XVIII) to show he or she "acted as a reasonable consumer would in light of all circumstances").

593. The Seventh Circuit determined that comparing receipts to posted prices "would require unreasonable efforts by consumers to protect themselves from deception." *Id.* at 599.

Here, Plaintiffs contend that Defendants' assertion that reasonable consumers could not be misled, because they had access to all relevant information on Capital One's website and in their account statements, stands analogous to Walmart's unsuccessful argument in *Kahn.* (Opp. at 47.) Defendants counter that "*Kahn* offers Plaintiffs no help," because Plaintiffs did not need to engage in "unreasonable efforts" to compare the 360 Savings interest rate listed in their account statements with the advertised 360 Performance Savings rate on the website. (Reply at 30–31 (citing CAC ¶¶ 69 n.23, 77).)[16] Yet under the facts alleged, the Court determines that it is probable that the objective, reasonable consumer, "acting reasonably in the circumstances," likely "could be misled" by the alleged deceptive conduct. *Dawson*, 716 F. Supp. 3d at 956. Here, reasonable 360 Savings accountholders would need to first log in to their 360 Savings accounts, open their account statements and find their current APY in small print. (CAC ¶ 77.) They would then need to go to the Capital One website, open the specific webpage promoting Capital One's savings products and identify that the 360 Performance Savings account was a distinct product with a different interest rate, and not merely their same product with a new name, despite the fact that the two accounts bear nearly identical names and were never listed side-by-side anywhere on Capital One's website. (*Id.* ¶ 75.)

---

[16]     Plaintiffs assert that *Kahn* "accords with many prior cases holding that companies cannot avoid liability by hiding the truth in fine print." (Opp. at 46 n.25 (first citing *Rivera v. Navient Sols., LLC*, 2020 WL 4895698 (S.D.N.Y. Aug. 19, 2020); and then citing *McKay v. Sazerac Co.*, 2023 WL 3549515 (N.D. Cal. May 17, 2023)).) Defendants counter that "Capital One hid nothing from Plaintiffs in fine print." (Reply at 31.) Although Plaintiffs allege that their 360 Savings account APY appeared "in small print under the name of the account," the Court agrees with Defendants that this case does not involve "hiding the truth in fine print." (CAC ¶ 77.) Nevertheless, this sub-argument does not alter the Court's "reasonable consumer" analysis.

While Defendants correctly note that Plaintiffs could technically compare their 360 Savings rate to the advertised rate for 360 Performance Savings, they ignore two significant questions.  First, why would an active accountholder of Capital One's 360 Savings product, which Defendants advertised as "high interest," return to Capital One's website to view Capital One's other account offerings?  *See Tlaib*, 691 F. Supp. 3d at 856 (requiring courts to consider the relevant circumstances under which a "reasonable consumer" operates, including "the context in which . . . information is provided and used").  Second, even assuming that reasonable 360 Savings accountholders did visit the website to view available account options, how would they know that an otherwise identical looking account, with a nearly identical name that adds only the single word "Performance," was a separate "high interest" savings product and not merely their existing product with a new name?  As Plaintiffs allege, all references to 360 Savings were removed from the website and replaced with the 360 Performance Savings account upon the latter's creation in September 2019.  (CAC ¶ 63.)

Thus, although the applicable interest rates were available to Plaintiffs via their account statements and the Capital One website, only an incredibly attentive consumer would be able to identify the distinction between the accounts.  The "objective, reasonable consumer" does not need to be such an "incredibly attentive consumer."  *Cf. Kahn*, 107 F.4th at 595, 597 ("human cognitive abilities are not perfect or infinite" and therefore courts must "consider the behavior of real consumers").  As the OCC has stated in an advisory letter on unfair and deceptive practices, banks must ensure that "customers receiving the information can reasonably be expected to understand the information . . . without having to do detective work."  OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices, 2002 WL 521380, at *5 (Mar. 22, 2002).  Viewing the facts in the light most favorable to Plaintiffs, the Court finds it probable that an

67

objective, reasonable consumer, without conducting detective work, "could be misled," as all individual Plaintiffs allege they were, under the circumstances. *Dawson*, 716 F. Supp. 3d at 956.

In this case, the Court has the benefit of being able to "consider the behavior of real consumers" through the alleged experiences of the individual Plaintiffs. *Kahn*, 107 F.4th at 597. For example, Plaintiff Uherbelau alleges that she "would check Capital One's main website pages . . . believing the published rate automatically applied to her accounts, as Capital One only listed one kind of savings product." (CAC ¶ 87.) Only in February 2024 did she discover that her 360 Savings accounts did not receive the advertised rate; she subsequently opened a 360 Performance Savings account to receive the high rate. (*Id.*) Plaintiff Brenner transferred money to his 360 Savings account in recent years as interest rates rose, "believing that it was still a variable interest rate account tied to the national rates." (*Id.* ¶ 93.) Only after reading a January 20, 2024 *Wall Street Journal* article did he learn of Defendants' alleged deceptive conduct and subsequently moved most of his money out of his 360 Savings account. (*Id.*) As these two examples highlight, "real consumers," who visited Capital One's website and monitored national interest rates, were misled under the circumstances by the alleged underlying conduct. Requiring Plaintiffs to uncover distinctions that attentive, engaged accountholders could not detect demands unreasonable efforts that surpass the objective, reasonable consumer standard.

Defendants also assert that Plaintiffs' deception claims cannot simply be a restatement of their breach of contract claim. (Mem. at 57.) However, Defendants' alleged deceptive and unfair conduct exists outside of the 360 Disclosures. In *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443 (E.D. Va. 2009), this Court allowed claims under the VCPA and the implied covenant of good faith and fair dealing to proceed, noting that the implied covenant claim did not "seek redress . . . merely for Defendant's unfavorable exercise of its explicit contractual rights."

*Id.* at 450. In that case, the defendant's alleged conduct was "not merely unfavorable, but actually dishonest," and therefore did not constitute an instance in which a plaintiff's claims only involved disagreement with the defendant's exercise of any explicit right under the contract. *Id.* at 450–51.

So too here does Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing (Count I) allege dishonesty in concealing the 360 Savings account's relegation and replacement in Capital One's advertising by the similarly named 360 Performance Savings, rather than any "unfavorable exercise of [Defendants'] explicit contractual rights" under the 360 Disclosures. *Id.* at 450. Plaintiffs' state statutory claims do not deny that "the [360 Disclosures] expressly allowed Capital One to adjust the rates," nor is this a case where Plaintiffs seek to enforce any "unfulfilled contractual promises" under the 360 Disclosures. (Mem. at 57.) Instead, the claims challenge the alleged fraudulent and deceptive behavior of Defendants in advertising and operating the savings accounts, specifically the furtive replacement and relegation of their 360 Savings accounts. Accordingly, the Court rejects Defendants' argument that Plaintiffs' deception claims merely restate a contract theory. *See also Marcus v. Dennis*, 2022 WL 1527524, at *9 (E.D. Va. May 13, 2022) (noting that the VCPA (Count II) "provides a statutory duty that exists independent of the [c]ontracts entered into between the parties to th[e] litigation and that the duty is not one existing between the parties solely by virtue of the contract") (internal quotations omitted); *cf. Cehula v. Janus Distribs., LLC*, 2008 WL 2890874, at *6 (W.D. Pa. July 23, 2008) (noting that while plaintiffs cannot bring a claim under the UTPCPL (Count VIII) for contractual nonfeasance or "failure to perform a contractual obligation," they can state a UTPCPL claim for contractual malfeasance or "improper performance of a contractual obligation").

For the foregoing reasons, the Court finds that Plaintiffs sufficiently allege unfair or deceptive conduct for purposes of the relevant statutory claims and the Court will DENY Defendant's Motion as to this argument.

**f.    Reasonable Reliance**

Defendants next contend that Plaintiffs fail to allege reasonable reliance as required in certain of their state statutory claims.[17] (Mem. at 58.)  Specifically, Defendants assert that even if Plaintiffs attempted to plead reliance on the representation that they would be paid a higher rate of interest, such reliance would not be reasonable because the 360 Disclosures gave CONA the right to adjust interest rates at any time at its discretion and Plaintiffs at all times knew or should have known the applicable rates.  (Mem. at 59 (citing CAC ¶¶ 5, 69 n.23, 77).)  Defendants further contend that Plaintiffs fail to plead how they relied to their detriment on the alleged misrepresentations or deception, because the vast majority of Plaintiffs opened their accounts before Capital One took over ING Direct.  (Mem. at 59–60 (citing CAC ¶ 55).)  Lastly, Defendants argue that it would be unreasonable for Plaintiffs to contend that they relied on alleged misrepresentations or deception to maintain their accounts after creation of the 360 Performance Savings account, because their actual interest rates were always disclosed on their monthly statements.  (*Id.* at 60.)  Plaintiffs counter that, to the extent that reliance is required under their statutory claims, the CAC adequately pleads it, because any person who remained a 360 Savings accountholder necessarily relied on Defendants' alleged deception, believing that their accounts remained "high interest" Capital One accounts.  (Opp. at 49.)

The Court first acknowledges, as it did in its analysis of the alleged misrepresentation and unfair or deceptive conduct, that not every statute implicated here utilizes the same exact

---

[17]     Defendants apply this argument to Counts II, III, IV, V, VIII, XI, XIII, XIV, XV and XVII.

language regarding the reliance element.  Nevertheless, because these claims are substantially similar, for the purposes of responding to Defendants' argument that Plaintiffs fail to demonstrate reasonable reliance, the Court, as it has done above, will analyze the element as a whole.

Stated broadly, "[r]eliance at its core is the action or inaction of a party that results from the misrepresentation of another." *White v. Kennedy Krieger Inst., Inc.*, 110 A.3d 724, 744 (Md. Ct. Spec. App. 2015) (defining "reliance" in the context of a Maryland fraudulent misrepresentation claim).  Reliance must be "reasonable and justified." *Adardour v. Am. Settlements Inc.*, 2009 WL 1971458, at *3 (E.D. Va. July 2, 2009) (analyzing a VCPA claim).[18] In the context of a fraudulent misrepresentation, reliance is only justifiable if "the fact misrepresented is material," meaning that "its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action."  Restatement (Second) of Torts § 538.  "[A] plaintiff cannot reasonably rely on an alleged misrepresentation in the face of plainly contradictory language contained in a contract or other document known by the plaintiff." *Adardour*, 2009 WL 1971458, at *3; *see also Bd. of Dirs. of Carrdinal Place Condominium v. Carrhomes P'ship*, 2000 WL 33406723, at *5 (Va. Cir. Ct. Dec. 21, 2000) (finding plaintiff's reliance on a verbal statement unreasonable "in the face of a document that openly indicates otherwise").  "[J]ustifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the

---

[18]      *See also Yocca v. Pittsburgh Steelers Sports Inc.*, 854 A.2d 425, 438 (Pa. 2004) (under the UTPCPL (Count VIII), a plaintiff must show he "justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance"); *Lynas v. Williams*, 454 S.E.2d 570, 574 (Ga. Ct. App. 1995) (finding "justifiable reliance is an essential element" of a claim under the Georgia FBPA (Count XIV)).

circumstances surrounding their transaction." *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007).

Defendants note that the 360 Disclosures granted CONA the right to adjust interest rates at its discretion and that Plaintiffs had access to both the 360 Savings APY on their account statements and the publicly advertised 360 Performance Savings APY on the Capital One website. (Mem. at 59.) However, when Plaintiffs signed up for their respective 360 Savings accounts, they did so with the reasonable expectation that their accounts, which Capital One labeled "high interest," would not later become relegated to a "much less than high interest" status in reference to another Capital One savings product — 360 Performance Savings — or that their accounts would subsequently be frozen at a low 0.30% APY. (CAC ¶¶ 67–74.)

Plaintiffs also relied on their 360 Savings accounts being *the* Capital One "high interest" savings product, and therefore legitimately did not understand that the nearly identically named 360 Performance Savings constituted an entirely different account, or that the rate advertised on Capital One's website did not apply to their 360 Savings accounts. The representation that their accounts were "high interest" clearly stands material here, because "a reasonable man would attach importance [to that term] in determining his choice of action," as demonstrated by Plaintiffs' allegation that "no rational person would maintain an identical account that paid materially lower interest absent Defendants' wrongful conduct." (*Id.* ¶ 129); Restatement (Second) of Torts § 538. When Capital One decided to freeze the 360 Savings rate at 0.30% APY from December 2020 onward, Plaintiffs' reliance further proved detrimental, with Plaintiffs earning much less in interest than they could have had they been aware of the fact that their accounts has been relegated to a non-high interest "legacy" status. (*See, e.g.*, CAC ¶¶ 89, 103.)

In *Kahn v. Walmart Inc.*, which the Court discussed in the previous section, the Seventh Circuit determined that comparing receipts to posted prices "would require unreasonable efforts by consumers to protect themselves from deception." 107 F.4th at 599. In that case, the plaintiff could compare a store receipt to the advertised prices, but the court still found plausible allegations of deception, because consumers would need to engage in unreasonable efforts to "compare the scanned prices with the shelf prices for all the items" to "reveal[] the discrepancy and dispel[] any potential deception." *Id.* The receipt constituted a document "known by the plaintiff" and containing "plainly contradictory language" to the advertised prices. *Adardour*, 2009 WL 1971458, at *3. Nevertheless, the Seventh Circuit determined that the plaintiff plausibly alleged a deceptive practice under the ICFA. *Kahn*, 107 F.4th at 598.

Here, Plaintiffs' 360 Savings account statements constitute a "document known by the plaintiff." *Adardour*, 2009 WL 1971458, at *3. However, like the plaintiff in *Kahn*, Plaintiffs in this case would need to engage in "unreasonable efforts" to (1) discover that their 360 Savings account was different from the similarly named, publicly advertised 360 Performance Savings account and (2) then locate and compare their interest rate to the advertised Performance Savings rate. *Kahn*, 107 F.4th at 599. Furthermore, Plaintiffs' 360 Savings account statements, on their face, did not present Plaintiffs with "plainly contradictory language" to the representation that their 360 Savings accounts were "high interest." *Adardour*, 2009 WL 1971458, at *3. Only by engaging in a highly attentive comparison of their account statements to the website's advertised 360 Performance Savings account would Plaintiffs discover that their accounts were no longer "high interest." (*See, e.g.*, CAC ¶ 87 (Plaintiff Uherbelau "would check Capital One's main website pages to determine the interest rate Capital One was offering . . . as Capital One only listed one kind of savings account product" and "deliberately opened a new 360 Performance

Savings account" once she discovered the alleged deception in February 2024), ¶ 95 (detailing Plaintiff Hans's multi-month effort to uncover "why he was not receiving Capital One's advertised interest rate for online savings accounts").)

Defendants also assert that the 360 Disclosures provided "plainly contradictory language" in stating that CONA could adjust the 360 Savings interest rate "at any time" at its discretion. (Mem. at 59 (citing CAC ¶ 5; ECF No. 30-1 at 3).) However, that contractual provision is not "plainly contradictory" to a representation of "high interest." Just because the 360 Disclosures allow CONA to vary the 360 Savings interest rate does not undermine the Plaintiffs' reliance on their 360 Savings accounts being a "high interest" Capital One savings product. The fact that Defendants advertised the otherwise identical 360 Performance Savings account as "high yield," and did in fact raise that newer product's interest rate in response to improved market conditions, only serves to support Plaintiffs' contention that they reasonably relied on the representation that their 360 Savings accounts would be earning "high interest" as well, even if CONA could vary rates over time. (CAC ¶¶ 68–74.) Furthermore, the contractual provision allowing CONA to vary rates at any time created a reasonable expectation that the 360 Savings rate would vary in conjunction with changes in the federal funds rate, as it had in the past. (*Id.* ¶ 71 ("Capital One raised the [360 Savings] interest rate in 2017 in response to changing market conditions.").) Reliance on that expectation proved detrimental when Capital One decided to freeze the 360 Savings rate at the low rate of 0.30% APY as of December 2020, while opting to raise the 360 Performance Savings rate when the federal funds rate rose. (*Id.* ¶¶ 67–68.)

The parties' focus on "presumed reliance"[19] in their briefing stands irrelevant here where the CAC directly alleges that "all Class members uniformly have relied on Defendants'

---

[19]      *See* Opp. at 49–50; Reply at 37.

conduct," because "[n]o rational person would maintain an identical account that paid materially lower interest absent Defendants' wrongful conduct." (*Id.* ¶ 129.) That CONA could vary rates at its discretion under the 360 Disclosures is not "plainly contradictory" to Plaintiff's reasonable expectation that the "high interest" 360 Savings account would not, unbeknownst to them, be relegated to a "much less than high interest" status in comparison to a separate, similarly named replacement account. *Adardour*, 2009 WL 1971458, at *3. Plaintiffs reasonably relied on the material "high interest" label to maintain their 360 Savings accounts. That label became untrue when Defendants furtively replaced 360 Savings with a new account with identical Disclosures and a nearly identical name, leaving Plaintiffs to believe that they continued to earn Capital One's advertised "high interest" rate when in fact they did not. Plaintiffs could not discover the distinction between the two accounts without unreasonable efforts, and, as rational consumers, they would not have maintained their non-"high interest" 360 Savings accounts had they been aware of that distinction. (*See, e.g.*, CAC ¶ 100 (Plaintiff Martindale "moved his money to savings accounts that paid a higher interest rate at a different bank" upon learning that 360 Savings had become an "antiquated account[]")); *see supra* Section III.D.1.e.

Taking the allegations in the light most favorable to the Plaintiffs, and noting that "justifiable reliance is typically a question of fact for the fact-finder to decide," the Court finds that Plaintiffs have sufficiently pled reasonable reliance as required under certain of their state statutory claims. *Toy*, 928 A.2d at 208. Thus, the Court will DENY Defendants' Motion to the extent that it seeks dismissal of any claims for failure to plausibly allege reasonable reliance.

### g.      Causation

As Defendants note, those of Plaintiffs' state statutory claims that do not require reliance do require at least a showing of causation between the alleged conduct and Plaintiffs' alleged

resulting harm. *See, e.g., Rhodes v. AIG Domestic Claims, Inc.*, 961 N.E.2d 1067, 1076 (Mass. 2012) (under Massachusetts Chapter 93A (Count IX), "a plaintiff must prove causation—that is, the plaintiff is required to prove that the defendant's unfair or deceptive act caused an adverse consequence or loss."); *Piescik v. CVS Pharmacy, Inc.*, 576 F. Supp. 3d 1125, 1132 (S.D. Fla. 2021) ("To state a damages claim under FDUTPA [Count XII], the plaintiff must allege: (1) a deceptive act or unfair practice[;] (2) causation; and (3) actual damages."); *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (under N.Y. Gen. Bus. Law. §§ 349–50 (Count VI), plaintiff must allege he "suffered injury as a result of the allegedly deceptive act or practice"); *Lincoln v. Ford Motor Co.*, 2020 WL 5820985, at *6 (D. Md. Sept. 29, 2020) (under Delaware CFA (Count XXI), plaintiff must allege "causal relationship exists between the defendant's unlawful conduct and the plaintiff's ascertainable loss"). Defendants contend that Plaintiffs fail to plead causation "for essentially the same reasons that they have failed to plead reasonable reliance." (Mem. at 61.) Namely, Defendants contend that causation is generally established only where the deceptive act or practice "could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted." (*Id.* (quoting *Hershenow v. Enter. Rent-A-Car Co. of Bos., Inc.*, 840 N.E.2d 526, 535 (Mass. 2006)).)

As the Court addressed in the previous section regarding reasonable reliance, Plaintiffs maintained their 360 Savings accounts on the expectation that the accounts were a Capital One "high interest" savings product and would not be relegated to an unsupported "legacy" status with a low frozen rate. Defendants' alleged fraudulent and deceptive conduct — removing any reference to the 360 Savings account on Capital One's website and replacing it with the similarly named and otherwise identical, but higher earning, 360 Performance Savings account — prevented the "reasonable consumer" from understanding that 360 Performance Savings was a

different product, and not their own savings account with a new name, without unreasonably attentive efforts and detective work.  (CAC ¶ 63–66); *see supra* Section III.D.1.e.

As a result, until Plaintiffs uncovered the alleged deception, "Capital One profit[ed] from paying less interest" to 360 Savings accountholders, with each Plaintiff "los[ing] out on interest payments proportionate to their account balances since September 2019."  (CAC ¶ 77, 79.)  But for Defendants' deceptive conduct, including the removal and replacement of references to the 360 Savings account on its webpage, Plaintiffs, as "reasonable consumers," could have understood the distinction between the products and made an informed decision to deposit their money either in a 360 Performance Savings account or with another bank.  (*See, e.g., id.* ¶ 89 (Plaintiff Wright alleges she "immediately opened and moved most of her funds to a 360 Performance Savings account" upon discovery that her 360 Savings account had been "grandfathered" in December 2023).)

Defendants point out that Plaintiffs indeed had the option, at any time, to open a 360 Performance Savings account or take their money elsewhere.  (Mem. at 55–57.)  However, as rational consumers, believing their accounts to earn "high interest" with no reasonable way to understand that this label was no longer accurate in the context of the similarly named replacement 360 Performance Savings account, Plaintiffs maintained their 360 Savings accounts for years, incurring significant financial loss.  Until they contacted Capital One representatives or read about the alleged deceptive conduct online or in news articles years later, Plaintiffs had no reasonable way to know that their accounts had become unsupported with a frozen rate of 0.30% APY.  (*See, e.g.*, CAC ¶¶ 86, 89.)

Accordingly, the Court finds that the alleged fraudulent and deceptive acts "reasonably . . . caused [Plaintiffs] to act different from the way [they] otherwise would have acted."

*Hershenow*, 840 N.E.2d at 535.  Thus, for those of Plaintiffs' state statutory claims that require

causation as an element, the CAC sufficiently pleads a causal link between Defendants' alleged

conduct and Plaintiffs' financial loss.  Therefore, the Court will DENY Defendants' Motion to

the extent that it claims that Plaintiffs fail to state any claim requiring causation as an element.

### 2.   Individual Statutory Claims

Having determined that Plaintiffs' state law claims survive Defendants' challenges based

on preemption and choice of law, and having considered and rejected Defendants' challenges to

Plaintiffs' claims on grounds of failure to satisfy Rule 9(b)'s heightened pleading requirements

and failure to allege a purchase or lease of goods or services, an actionable misrepresentation,

unfair or deceptive conduct, reasonable reliance and causation, the Court now briefly addresses

each state statutory claim in turn.  Unless otherwise noted, Plaintiffs bring these claims against

both Defendants.

### a.   Count II:  VCPA (against COFC only)

The VCPA is "remedial legislation to promote fair and ethical standards of dealings

between suppliers and the consuming public."  Va. Code Ann. § 59.1-197.  "To state a claim

under the VCPA, a plaintiff must allege (1) fraud[20] (2) by a supplier (3) in connection with a

consumer transaction."  *Borg v. Warren*, 545 F. Supp. 3d 291, 322 (E.D. Va. 2021).

Furthermore, "Virginia courts have consistently held that reliance is required to establish a

VCPA claim."  *Adardour v. Am. Settlements Inc.*, 2009 WL 1971458, at *3 (E.D. Va. July 2,

2009).  Under the VCPA, a "consumer transaction" is defined as the "advertisement, sale, lease,

license, or offering for sale, lease or license, of goods or services to be used primarily for

---

[20]    The VCPA's statutory language covers a broad range of unlawful conduct, not merely
fraud.  *See* Va. Code Ann. § 59.1-200(14) (prohibiting "any other deception, fraud, false
pretense, false promise, or misrepresentation in connection with a consumer transaction").

personal, family or household purchases." Va. Code Ann. § 59.1-198.  A "supplier" is defined as "a seller . . . who advertises, solicits, or engages in consumer transactions."  *Id.*

Defendants' Motion seeks to dismiss Count II on the following grounds:  failure to allege a consumer transaction via the purchase of goods or services, failure to meet the heightened pleading standard for claims sounding in fraud, failure to allege actionable misrepresentation, failure to allege unfair or deceptive conduct and failure to allege reasonable reliance.  Per the above discussion, the Court has already considered these arguments relative to all counts to which they apply, including Count II, and has rejected all of them.  *See supra* Section III.1.D.b–f.  The Court also finds that COFC qualifies as a "supplier" under the VCPA, because it "advertise[d], solicit[ed], or engage[d] in consumer transactions," namely the opening of Plaintiffs' 360 Savings accounts. Va. Code Ann. § 59.1-198.  Accordingly, the Court finds that Plaintiffs have satisfactorily alleged all elements for a VCPA claim.

Defendants raise a separate challenge to this claim, arguing that the VCPA does not apply to banks. (Mem. at 46.)  The relevant statutory language states the following:  "Nothing in this chapter shall apply to: . . . Banks, savings institutions, credit unions . . . ." Va. Code Ann. § 59.1-199(4).  Plaintiffs specifically bring this Count solely against COFC, in recognition that CONA clearly qualifies as a "bank" under the statute. (Opp. at 50.)  However, Defendants contend that COFC also qualifies as a bank, because it constitutes "a person engaged in the business of banking." (Mem. at 46 n.16 (quoting Va. Code Ann. § 8.4-105).)  In support of this argument, Defendants note that the CAC expressly alleges that COFC engaged in banking activity by "creat[ing] a new" type of savings account. (Reply at 38 (citing CAC ¶ 139(a)).)

The Court finds Plaintiffs' counterarguments more persuasive.  As Plaintiffs note, the CAC specifically alleges that COFC "is a holding company." (Opp. at 51 (citing CAC ¶ 41).)

Further, the statutory definition of "bank" that Defendants cite comes from the Virginia Commercial Code, an entirely different section of the state code.  (Opp. at 50 n.29 (citing Va. Code Ann. § 8.4-105).)  That statutory provision specifically states that its listed definitions, including the definition of "bank," apply "[i]n this title," meaning within the Virginia Commercial Code only.  Va. Code Ann. § 8.4-105.  Had the state legislature intended to include this specific definition of "bank" within the VCPA, they could have done so.  *See* Va. Code Ann. § 59.1-198 (listing various definitions that apply under the VCPA).

Notably, the provision exempting banks and other entities from VCPA coverage expressly excludes "mortgage lenders as defined in [Va. Code Ann.] § 6.2-1600, broker-dealers as defined in [Va. Code Ann.] § 13.1-501, [and] gas suppliers as defined in subsection E of [Va. Code Ann.] § 56-235.8."  *Id.* § 59.1-199(4).  Thus, the VCPA specifically references other sections of the Virginia Code to define mortgage lenders, broker-dealers and gas suppliers.  It would be irrational for the legislature to apply specific definitions of these terms from separate sections of the Virginia Code but not point to Section 8.4-105 if it intended to apply the Virginia Commercial Code's definition of a "bank" to the VCPA.  Under these circumstances, the Court finds it improper to apply the Virginia Commercial Code's definition of "bank" to defeat Plaintiffs' VCPA claim.

The Court also acknowledges that, under the federal Bank Holding Company Act, a "bank holding company is defined as any corporation, partnership, business trust, association, or similar organization that owns or controls a bank or another bank holding company."  *Indep. Cmty. Bankers Ass'n of South Dakota, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 820 F.2d 428, 430 (D.C. Cir. 1987) (citing 12 U.S.C. § 1841(a)(1), (b)).  That statute also includes specific definitions for a "bank."  12 U.S.C. § 1841(c).  Title 6.2 of the Virginia Code, which addresses

"Financial Institutions and Services," also separately defines "bank" and "bank holding company" as two distinct terms. Va. Code Ann. § 6.2-800. The Court recognizes that these statutory definitions do not come from the VCPA, but nevertheless emphasizes that holding companies and banks are defined as separate entities under both federal law and a separate title within the Virginia Code.[21] Once again, had the Virginia legislature intended to specifically define the term "bank holding company" within the VCPA or explicitly include that term within the VCPA's definition of "bank," it could have done so. Without clear evidence to the contrary, the Court interprets a "bank" and a "bank holding company" to encompass separate entities under the VCPA and accordingly finds that COFC does not stand exempt from the statute.

Further, nowhere in the case cited by Defendants does the court use the term "holding company" to determine that the VCPA did not apply to a bank defendant. *McLean v. BB&T Bank Corp.*, 2020 WL 2744107, at *2 (E.D. Va. Jan. 13, 2020). It is unclear whether that defendant held itself out as a bank holding company, because the court did not use the term "holding company" anywhere in its opinion, holding merely that the defendant "is a bank." *Id.* Here, lacking any clear indication that a bank holding company qualifies as a "bank" under the VCPA, the Court interprets "holding company" to carry a different meaning than "bank," regardless of any allegations as to COFC's banking-related conduct.

For all these reasons, the Court will DENY Defendants' Motion as to Count II.

  **b.**  **Count III: CLRA**

The CLRA prohibits "unfair or deceptive acts or practices . . . in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). The statute is to "be liberally construed and applied to promote its underlying

---

[21]  Defendants make reference to the Bank Holding Company Act, stating that "COFC is a 'bank holding company' under 12 U.S.C. § 1841." (Mem. at 46 n.16.)

purposes, which are to protect consumers against unfair and deceptive business practices." *Id.* § 1760. To state a claim under the CLRA, "a plaintiff must show (1) the defendant engaged in deceptive conduct and (2) the deception caused plaintiff harm." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1034 (9th Cir. 2024). The CLRA also "imposes a similar reliance requirement" to that required under the UCL, the other California statute under which Plaintiffs assert a claim in this case (Count IV). *Kane v. Chobani, Inc.*, 2013 WL 5289253, at *8 (N.D. Cal. Sept. 19, 2013). Per the statutory text, a plaintiff pursuing a claim under the CLRA must qualify as a "consumer" who "seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761(d).

The Court has already considered all of the grounds for dismissal asserted by Defendants that are relevant to Count III. *See supra* Section III.D.1.b (failure to satisfy the heightened pleading standard for claims sounding in fraud); Section III.D.1.c (failure to allege a consumer purchase of goods or services); Section III.D.1.d (failure to allege an actionable misrepresentation); Section III.D.1.e (failure to allege unfair or deceptive conduct); Section III.D.1.f (failure to allege reasonable reliance). Given that the CLRA also requires causation, the Court will interpret Defendants' challenge on causation grounds to apply to this count as well. *See supra* Section III.D.1.g. The Court has denied Defendants' Motion as to all of these grounds.

Accordingly, the Court will DENY Defendants' Motion as to Count III.

### c.    **Count IV: UCL**

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010). Overall, to

state a claim under the UCL, a plaintiff needs to have "suffered injury in fact and . . . lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. A UCL claim under the "unlawful" prong is properly pled by alleging violation of another statute. *Rubio*, 613 F.3d at 1204. Courts have also held that plaintiffs properly plead a violation under the "fraudulent" prong utilizing the "reasonable consumer test" and "show[ing] that [reasonable] members of the public are likely to be deceived." *Id.* Lastly, for the "unfair" prong, some courts have applied a balancing test, which "weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 56 (E.D.N.Y. 2014). "The balancing test . . . is fact intensive and is not conducive to resolution at the [motion to dismiss] stage." *Progressive W. Ins. Co. v. Yolo Cnty. Superior Ct.*, 37 Cal. Rptr. 3d 434, 453 (Cal. Ct. App. 2005). Other courts have required plaintiffs to allege that the conduct violates public policy, as "tethered to specific constitutional, statutory or regulatory provisions." *Bardin v. Daimlerchrysler Corp.*, 39 Cal. Rptr. 3d 634, 636 (Cal. Ct. App. 2006).

Distinguishing claims under the UCL from common law fraud, some courts have found that plaintiffs need not show reliance to state a claim for fraudulent business acts. *See, e.g., In re HSBC Bank USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d at 55 (stating "a plaintiff need not show reliance to state a claim" under the UCL, but rather "need only allege that the public is likely to be deceived"). However, other courts have found that, to the extent that the alleged "conduct is based on misrepresentations," a plaintiff must plead reliance under any of the three UCL prongs. *Kane v. Chobani*, 2013 WL 5289253, at *6 (N.D. Cal. Sept. 19, 2013).

Here, Plaintiffs adequately plead claims under all three of the UCL prongs. First, because the Court has identified satisfactory allegations of violations of various state statutes,

including California's CLRA (Count III), Plaintiffs can plead a claim under the "unlawful" prong. *See supra* Section III.D.2.b.  Plaintiffs have alleged that reasonable consumers under the circumstances stood likely to be deceived into thinking that their 360 Savings accounts remained a "high interest" Capital One savings product, in satisfaction of the pleading requirements for the "fraudulent" prong. *See supra* Section III.D.1.e.  Lastly, as to the "unfair" prong, the Court makes no finding as to which test applies.  Nevertheless, the "fact intensive" balancing test stands "not conducive to resolution" at this stage, and the alternative "public policy" test is satisfied by the tethering of this claim to the CLRA's (Count III) statutory prohibitions against deceptive acts and practices in consumer transactions. *Progressive W. Ins. Co.*, 37 Cal. Rptr. 3d at 453; *Bardin*, 39 Cal. Rptr. 3d at 636.  The Court has also considered and rejected Defendants' arguments, as applicable to Count IV, that Plaintiffs fail to satisfy the heightened pleading requirements for claims that sound in fraud and fail to allege actionable misrepresentation, unfair or deceptive conduct, reasonable reliance and causation. *See supra* Section III.1.D.b, d–g.

For the foregoing reasons, the Court will DENY Defendants' Motion as to Count IV.

### d.    Count V:  Texas DTPA

The Texas DTPA "shall be liberally construed and applied to promote its underlying purposes," which include "protect[ing] consumers against false, misleading, or deceptive business practices." Tex. Bus. & Com. Code Ann. § 17.44(a).  Under the Texas DTPA, a plaintiff must show that "(1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages." *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 478 (Tex. 1995).  Courts have also interpreted the Texas DTPA as containing a reliance element when misrepresentation is alleged. *Wu v. Lumber Liquidators, Inc.*, 2024 WL 3160554, at *15 (Tex. App. June 25,

2024).  The statute defines a "consumer" as one who "seeks or acquires by purchase or lease, any goods or services."  Tex. Bus. & Com. Code Ann. § 17.45(4).  Among the statute's listed "false, misleading, or deceptive acts or practices" are "representing that goods or services have . . . characteristics . . . which they do not have" and "advertising goods or services with intent not to sell them as advertised."  *Id.* § 17.46(b)(5), (9).

Defendants raise the following challenges to Count V:  failure to satisfy the heightened pleading standard for claims sounding in fraud, failure to allege a consumer purchase of goods or services, failure to allege an actionable misrepresentation, failure to allege unfair or deceptive conduct and failure to allege reliance.  Given that the Texas DTPA also requires causation, the Court will interpret Defendants' challenge on causation grounds to apply to this count as well.  As addressed above, the Court rejects all of these arguments.  *See supra* Section III.D.1.b–g.

Accordingly, the Court will DENY Defendants' Motion as to Count V.

### e.    Count VI:  New York General Business Law

New York General Business Law Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."  N.Y. Gen. Bus. Law § 349.  General Business Law Section 350 also prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service."  *Id.* § 350.  To state a claim under either New York General Business Law Sections 349 or 350, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015).  An act is "misleading" under these laws if it stands "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007).

The Court has already considered all of the grounds for dismissal asserted by Defendants that are relevant to Count VI. *See supra* Section III.D.1.b (failure to satisfy the heightened pleading standard for claims sounding in fraud); Section III.D.1.d (failure to allege an actionable misrepresentation); Section III.D.1.g (failure to allege causation). The Court has denied Defendants' Motion as to all of these grounds. The Court also determines that, as relevant to this claim, the alleged conduct is clearly "consumer-oriented," as Defendants' actions involved the marketing, advertisement and maintenance of Plaintiffs' online savings accounts. *Orlander*, 802 F.3d at 300. Further, the Court has addressed how Defendants' alleged deceptive conduct was "materially misleading," encouraging Plaintiffs to maintain their 360 Savings accounts on the reasonable expectation that they remained a "high interest" Capital One savings offering. *Id.*; *see supra* Section III.D.1.e.

Thus, the Court will DENY Defendants' Motion as to Count VI.

### f.    Count VII: NJCFA

New Jersey's NJCFA prohibits "[t]he act, use or employment . . . of any . . . deception, fraud . . . misrepresentation . . . or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. § 56:8-2. "Merchandise" includes "goods . . . services or anything offered, directly or indirectly to the public for sale." *Id.* § 56:8-1(c). Under the NJCFA, a plaintiff can state a claim by alleging "(1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Burns v. TD Bank, N.A.*, 2022 WL 17547258, at *9 (D.N.J. Dec. 8, 2022). The NJCFA "does not require proof that a consumer has actually relied on a

prohibited act in order to recover." *Int'l Union Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1087 (N.J. 2007).

The Court has already considered all of the grounds for dismissal asserted by Defendants that are relevant to Count VII. *See supra* Section III.D.1.b (failure to satisfy the heightened pleading standard for claims sounding in fraud); Section III.D.1.d (failure to allege an actionable misrepresentation); Section III.D.1.e (failure to allege unfair or deceptive conduct); Section III.D.1.g (failure to allege causation). Per the above discussion, the Court has found all of these arguments unpersuasive. The Court also has determined that Plaintiffs' opening of their 360 Savings accounts qualifies as a purchase of a "service," as they sought out the service of obtaining "high interest" on their funds. *See supra* Section III.D.1.c. Thus, the 360 Savings accounts constitute "merchandise" sufficient to trigger this statute. N.J. Stat. Ann. § 56:8-1(c).

Therefore, the Court will DENY Defendants' Motion as to Count VII.

### g.    Count VIII: UTPCPL

Pennsylvania's UTPCPL prohibits a variety of unfair and deceptive acts or practices, including "[r]epresenting that goods or services have . . . characteristics . . . that they do not have," "[a]dvertising goods or services with intent not to sell them as advertised" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. § 201-2(4)(v), (ix), (xxi). A private action may be brought under the statute by anyone "who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property." *Id.* § 201-9.2(a). "[C]ourts should liberally construe the UTPCPL in order to effect the legislative goal of consumer protection." *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 151 (Pa. Super. Ct. 2012). To state a claim under the

UTPCPL, a plaintiff must allege that "(1) he or she is a purchaser or lessee; (2) the transaction is dealing with 'goods or services'; (3) that the good or service was primarily for personal, family, or household purposes; and (4) that he or she suffered damages arising from the purchase or lease of goods or services." *Keller v. Volkswagen of Am., Inc.*, 733 A.2d 642, 646 (Pa. Super. Ct. 1999). In addition to establishing a causal link between the alleged deceptive acts and an ascertainable loss, the plaintiff must also demonstrate justifiable reliance. *Cehula v. Janus Distribs, LLC*, 2008 WL 2890874, at *4 (W.D. Pa. July 23, 2008).

As addressed above, the Court finds that the opening of the 360 Savings accounts constituted a purchase of "services," specifically, the service of receiving "high interest" on one's savings deposits. *See supra* Section III.D.1.c. As the 360 Disclosures stated, the 360 Savings accounts were "primarily for personal, family, or household purposes." (ECF 30-1 at 5.) Thus, Plaintiffs satisfy the initial threshold for bringing a private action under the UTPCPL. 73 Pa. Cons. Stat. § 201-9.2(a). Defendants' Motion seeks to dismiss Count VIII on the following additional grounds: failure to allege a consumer transaction via the purchase of goods or services, failure to meet the heightened pleading standard for claims sounding in fraud, failure to allege actionable misrepresentation, failure to allege unfair or deceptive conduct, failure to allege reasonable reliance and failure to allege causation. Per the above discussion, the Court has already considered and rejected all of these arguments relative to all counts to which they apply, including Count VIII. *See supra* Section III.1.D.b–g.

For these reasons, the Court will DENY Defendants' Motion as to Count VIII.

### h.   Count IX: Massachusetts Chapter 93A

Massachusetts Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. A plaintiff can state a claim under

Massachusetts Chapter 93A by alleging "(1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury." *Tomasella v. Nestlé USA, Inc.*, 962 F.3d 60, 71 (1st Cir. 2020). A practice is deceptive if it "has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted." *Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d 476, 488 (Mass. 2004). "Chapter 93A does not require a showing of reliance." *Cormier v. Carrier Corp.*, 2019 WL 1398903, at *4 (C.D. Cal. Mar. 25, 2019).

The Court has previously considered all of the grounds for dismissal asserted by Defendants relevant to Count IX. *See supra* Section III.D.1.b (failure to satisfy the heightened pleading standard for claims sounding in fraud); Section III.D.1.d (failure to allege an actionable misrepresentation); Section III.D.1.e (failure to allege unfair or deceptive conduct); Section III.D.1.g (failure to allege causation). Per the above discussion, the Court has found all of these arguments unpersuasive.

For these reasons, the Court will DENY Defendants' Motion as to Count IX.

### i.    Count X: ICFA

Illinois's ICFA should be "liberally construed to effectuate its purpose." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). To state a claim under the ICFA, a plaintiff must show that "(1) the defendant committed a deceptive act or practice; (2) the defendant intended for the plaintiff to rely on the deception; (3) the deception happened in the course of trade or commerce; and (4) the deception proximately caused the plaintiff's injury." *Mihalich v. Johnson & Johnson*, 2016 WL 5106970, at *3 (S.D. Ill. Sept. 20, 2016). "A viable

claim under the ICFA may be asserted by alleging the concealment . . . of a material fact."

*Rieger v. Volkswagen Grp. of Am., Inc.*, 2023 WL 3271116, at *19 (D.N.J. May 4, 2023).

Defendants' Motion seeks to dismiss Count X on the following grounds:  failure to meet the heightened pleading standard for claims sounding in fraud, failure to allege actionable misrepresentation, failure to allege unfair or deceptive conduct and failure to allege causation. Per the above discussion, the Court has already considered these arguments relative to all counts to which they apply, including Count X, and has found all of them unavailing. *See supra* Section III.1.D.b, d–e, g.  Further, because the Court has determined that Plaintiffs' opening of their 360 Savings accounts constituted a purchase of services, the alleged deception "happened in the course of trade or commerce." *Mihalich*, 2016 WL 5106970, at *3; *see supra* Section III.1.D.c.

Therefore, the Court will DENY Defendants' Motion as to Count X.

### j.  **Count XI:  MCPA**

The Maryland state legislature enacted the MCPA to "take strong protective and preventative steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland."  Md. Code Ann., Com. Law § 13-102(3).  The Act is to "be construed and applied liberally to promote its purpose."  *Id.* § 13-105.  Among the prohibited unfair and deceptive trade practices are any "misleading oral or written statement . . . which has the capacity, tendency, or effect of deceiving or misleading consumers," and "deception, fraud . . . misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same."  *Id.* § 13-301(1), (9).  Under the MCPA, plaintiffs state a claim by plausibly pleading "(1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3)

causes them actual injury." *Currie v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 788, 796 (D. Md. 2013).

The Court has previously addressed all of Defendant's arguments that present grounds for dismissal against Count XI. *See supra* Section III.D.1.b (failure to satisfy the heightened pleading standard for claims sounding in fraud); Section III.D.1.d (failure to allege an actionable misrepresentation); Section III.D.1.e (failure to allege unfair or deceptive conduct); Section III.D.1.f (failure to allege reasonable reliance); Section III.D.1.g (failure to allege causation). Per the above discussion, the Court has rejected all of these arguments.

Thus, the Court will DENY Defendants' Motion as to Count XI.

### k.    Count XII: FDUTPA (against COFC only)

Florida's FDUTPA was enacted "[t]o protect the consuming public . . . from . . . unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). "To state a claim under the FDUTPA, a plaintiff must allege (1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Borg v. Warren*, 545 F. Supp. 3d 291, 329 (E.D. Va. 2021). "Deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1105 (S.D. Fla. 2019).

Defendants' Motion seeks to dismiss Count XII on the following grounds:  failure to meet the heightened pleading standard for claims sounding in fraud, failure to allege actionable misrepresentation, failure to allege unfair or deceptive conduct and failure to allege causation. Per the above discussion, the Court has already considered these arguments relative to all counts

to which they apply, including Count XII, and has found all of them unconvincing. *See supra*
Section III.1.D.b, d–e, g.

As with the VCPA, Defendants raise a separate challenge to this claim, arguing that the
FDUTPA does not apply to banks. (Mem. at 46.)  The relevant statutory language states that the
law "does not apply to . . . [b]anks or savings and loan associations regulated by federal
agencies." Fla. Stat. § 501.212(4)(c).  Plaintiffs specifically bring this Count solely against
COFC, asserting that COFC does not qualify as a "bank." (Opp. at 57.)  However, Defendants
contend that COFC does qualify as a bank, citing *Bankers Trust Co. v. Basciano*, 960 So. 2d 773
(Fla. Dist. Ct. App. 2007), in which the court held that the FDUTPA "does not apply to banks
and savings and loan associations regulated by the state or the federal government." *Id.* at 778;
(Mem. at 46).  However, as Plaintiffs note, the court in that case also stated that "[n]othing in
FDUTPA suggests that bank subsidiaries, affiliates or agents are necessarily exempt from
FDUTPA,"  (Opp. at 57 (quoting *Bankers Tr. Co.*, 960 So. 2d at 779)), indicating a narrow scope
for the bank exemption that is limited only to licensed banks and does not apply to bank-adjacent
entities like holding companies.  Defendants cite no other case or any statutory definition to
support the proposition that a holding company stands exempt under the statute.

As it did above in the context of the VCPA, the Court notes that, under the Bank Holding
Company Act, a "bank holding company is defined as any corporation, partnership, business
trust, association, or similar organization that owns or controls a bank or another bank holding
company." *Indep. Cmty. Bankers Ass'n of South Dakota, Inc. v. Bd. of Governors of Fed. Rsrv.
Sys.*, 820 F.2d 428, 430 (D.C. Cir. 1987) (citing 12 U.S.C. § 1841(a)(1), (b)).  That statute also
includes specific definitions for a "bank." 12 U.S.C. § 1841(c).  In a separate section of the
Florida Statutes, the legislature defines a "bank holding company" as "any business organization

that is a bank holding company under the Bank Holding Company Act." Fla. Stat. § 655.005.

Yet another Florida statutory section defines a "bank holding company" as "any business

organization which has or acquires control over any bank or trust company." *Id.* § 658.27.

While these statutory definitions do not apply to the FDUTPA, they nevertheless highlight that

holding companies and banks are defined as separate entities under federal and Florida state law.

Had the Florida legislature intended to specifically define the term "bank" under the FDUTPA to

include a "bank holding company," it could have done so.  With no precedent indicating that

COFC, a bank holding company, qualifies as a "bank" or another exempted entity under the

statute, the Court therefore finds that COFC does not stand exempt from an FDUTPA claim.

For all these reasons, the Court will DENY Defendants' Motion as to Count XII.

### I.      Count XIII:  NC UDTPA

North Carolina's UDTPA prohibits "unfair or deceptive acts or practices in or affecting

commerce."  N.C. Gen. Stat. § 75-1.1(a).  The statute defines "commerce" to include "all

business activities." *Id.* § 75-1.1(b).  To state a claim under the NC UDTPA, "a plaintiff must

plead (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which

proximately caused injury to plaintiff." *Withers v. BMW of N. Am., LLC*, 560 F. Supp. 3d 1010,

1019 (W.D.N.C. 2021).  Further, "[w]here an unfair or deceptive practice claim is based upon an

alleged misrepresentation . . . the plaintiff must show 'actual reliance' on the alleged

misrepresentation in order to establish that the alleged misrepresentation 'proximately caused'

the injury." *Sunset Beach Dev., LLC v. AMEC, Inc.*, 675 S.E.2d 46, 53 (N.C. Ct. App. 2009).

Defendants' Motion seeks to dismiss Count XIII on the following grounds:  failure to

meet the heightened pleading standard for claims sounding in fraud, failure to allege actionable

misrepresentation, failure to allege unfair or deceptive conduct, failure to allege reasonable

reliance and failure to allege causation.  As addressed above, the Court has already considered and rejected these arguments relative to all counts to which they apply, including Count XIII. *See supra* Section III.1.D.b, d–g.  The Court also notes that, because engaging in banking and opening a savings account constitutes a "business activity," the alleged conduct "affect[s] commerce" as required to trigger the statute.  N.C. Gen. Stat. § 75-1.1(a)–(b).

Thus, the Court will DENY Defendants' Motion as to Count XIII.

### m.    Count XIV:  Georgia FBPA

The Georgia FBPA prohibits "unfair or deceptive acts or practices in the conduct of consumer transactions," listing several examples of unlawful practices "[b]y way of illustration only and without limiting the scope" of the law's application.  Ga. Code Ann. § 10-1-393(a)–(b). The state legislature intended that the statute would "be liberally construed and applied." *Id.* § 10-1-391.  To state a claim under the Georgia FBPA, a plaintiff must allege "a violation of the Act, causation, and injury." *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1289 (N.D. Ga. 2018).  Furthermore, "justifiable reliance is an essential element of an FBPA claim." *Id.* at 1289–90.  The statute defines "consumer transactions" to include "the sale, purchase, lease or rental of goods [and] services." Ga. Code Ann. § 10-1-392(10).  "Consumer acts or practices" include those acts "intended to encourage consumer transactions." *Id.* § 10-1-392(7).

The Court has previously considered all of the grounds for dismissal asserted by Defendants relevant to Count XIV. *See supra* Section III.D.1.b (failure to satisfy the heightened pleading standard for claims sounding in fraud); Section III.D.1.c (failure to allege a consumer transaction via purchase of goods or services); Section III.D.1.d (failure to allege an actionable misrepresentation); Section III.D.1.f (failure to allege reasonable reliance); Section III.D.1.g

94

(failure to allege causation).  The Court has denied Defendants' arguments as to all of these grounds.

Therefore, the Court will DENY Defendants' Motion as to Count XIV.

### n.   Count XV: Oregon UTPA

Unlawful trade practices under the Oregon UTPA include "[r]epresent[ing] that . . . goods or services have . . . characteristics . . . or qualities that . . . [they] do not have," "[a]dvertis[ing] . . . goods or services with intent not to provide the . . . goods or services as advertised" and [e]ngag[ing] in any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(1)(e), (i), (u).  Under the Oregon UTPA, a plaintiff must establish that "(1) the defendant committed an unlawful trade practice; (2) plaintiff suffered an ascertainable loss of money or property; and (3) plaintiff's injury (ascertainable loss) was the result of the unlawful trade practice." *Smallman v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175, 1208 (D. Nev. 2022). Further, to the extent that an Oregon UTPA claim is based on an affirmative misrepresentation, "the causal element requires proof of reliance-in-fact by the consumer." *Harney v. Associated Materials, LLC*, 2018 WL 468303, at *5 (D. Or. Jan. 18, 2018).

Defendants' Motion seeks to dismiss Count XIII on the following grounds:  failure to meet the heightened pleading standard for claims sounding in fraud, failure to allege actionable misrepresentation, failure to allege unfair or deceptive conduct, failure to allege reasonable reliance and failure to allege causation.  As addressed above, the Court has already considered and rejected these arguments relative to all counts to which they apply, including Count XV. *See supra* Section III.1.D.b, d–g.

Thus, the Court will DENY Defendants' Motion as to Count XV.

95

### o.     Count XVI:  Ohio DTPA

In seeking to dismiss Count XVI, Defendants raise both procedural and substantive arguments.  The Court first addresses standing, because an "absence of standing deprives the court of the power to adjudicate" the merits of the claim.  *Griffin v. Dep't of Lab. Fed. Credit Union*, 293 F. Supp. 3d 576, 578 (E.D. Va. 2018), *aff'd*, 912 F.3d 649 (4th Cir. 2019).

The majority position among Ohio courts is that the Ohio DPTA "does not provide consumers standing." *Brown v. Madison Reed, Inc.*, 622 F. Supp. 3d 786, 797 (N.D. Cal. 2022), *aff'd*, 2023 WL 8613496 (9th Cir. Dec. 13, 2023).  As the District Court for the Southern District of Ohio has explained, the Sixth Circuit's "only venture" into whether the statute confers standing on individual consumers "approved of the majority position" that consumers lack standing to raise Ohio DTPA claims.  *Gentile v. Merck & Co., Inc.*, 2022 WL 1084883, at *3 (S.D. Ohio Apr. 11, 2022) (citing *Holbrook v. La.-Pac. Corp.*, 533 F. App'x 493, 497–98 (6th Cir. 2013)).  Relying on the Sixth Circuit's decision in *Holbrook*, the *Gentile* court found that "the substantially similar federal law, the Lanham Act, denies consumers standing" and also that, because the state high court has not yet addressed the issue, "there is no strong indication that the Ohio Supreme Court would conclude otherwise."  *Id.*  Here, the Court declines to stray from this majority position and therefore finds that Plaintiffs lack standing to assert Count XVI.

Moreover, the Court does not stand persuaded by Plaintiffs' citations to prior cases in which the Southern District of Ohio did find standing for consumers under the statute.  (Opp. at 59 (first citing *Schumacher v. State Auto. Mut. Ins. Co.*, 47 F. Supp. 3d 618, 630–32 (S.D. Ohio 2014); and then citing *Bower v. Int'l Bus. Machs., Inc.*, 495 F. Supp. 2d 837, 844 (S.D. Ohio 2007)).)  Rather, the Court chooses to take direction from *Gentile*, as (1) a more recent decision from (2) the same court that previously decided *Schumacher* and *Bower*, and (3) that addresses

96

the split in authority while following the Sixth Circuit's decision in *Holbrook* to deny consumers

standing under the Ohio DTPA. Therefore, in accordance with the majority position among

Ohio courts, this Court finds that Plaintiffs lack standing to raise a claim under the Ohio DTPA.

The Court will GRANT Defendants' Motion as to Count XVI and will DISMISS this claim.

### p.    Count XVII:  Michigan CPA

The Michigan CPA prohibits "deceptive methods, acts or practices in the conduct of trade

or commerce." Mich. Comp. Laws § 445.903(1). Included among the prohibited acts are

"[r]epresenting that goods or services have . . . characteristics . . . that they do not have" and

"[a]dvertising or representing goods or services with intent not to dispose of those goods or

services as advertised or represented." *Id.* § 445.903(1)(c), (g). A plaintiff pleading a Michigan

CPA claim must demonstrate a causal link between his injury and the underlying alleged

deceptive act or practice, as well as reliance when the claim sounds in fraud. *Shain v. Advanced

Techs. Grp., LLC*, 2017 WL 768929, at *11 (E.D. Mich. Feb. 28, 2017); *In re OnStar Cont.

Litig.*, 278 F.R.D. 352, 376 (E.D. Mich. 2011).

Defendants' Motion seeks to dismiss Count XVII on the following grounds:  failure to

meet the heightened pleading standard for claims sounding in fraud, failure to allege a consumer

transaction via purchase of goods or services, failure to allege actionable misrepresentation,

failure to allege unfair or deceptive conduct, failure to allege reasonable reliance and failure to

allege causation. The Court has already considered and rejected these arguments relative to all

counts to which they apply, including Count XVII. *See supra* Section III.1.D.b–g.

Defendants assert a separate challenge that the Michigan CPA claim should be dismissed

under a statutory exemption, which states that the law does not apply to a "transaction or conduct

specifically authorized under laws administered by a regulatory board or officer acting under

97

statutory authority of . . . the United States." Mich. Comp. Laws § 445.904(1)(a).  Defendants

contend that, because the NBA and OCC regulations authorize national banks to accept deposits,

the underlying transactions in this case stand exempt under the Michigan CPA.  (Mem. at 47

(citing 12 C.F.R. § 7.4007(a)).)  Plaintiffs counter that the "regulated business" exemption is an

affirmative defense that is "not susceptible to resolution on a motion to dismiss."  (Opp. at 59–60

(citing *Golden Star Wholesale, Inc. v. ZB Importing, Inc.*, 531 F. Supp. 3d 1231, 1253 (E.D.

Mich. 2021)).)

      The Michigan Supreme Court has held that "the relevant inquiry is not whether the

specific misconduct alleged by the plaintiffs is 'specifically authorized.'  Rather, it is whether the

general transaction is specifically authorized by law, regardless of whether the specific

misconduct alleged is prohibited." *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28, 38 (Mich.

1999).  Further, "[c]ourts generally cannot grant motions to dismiss on the basis of an affirmative

defense unless the plaintiff has anticipated the defense and explicitly addressed it in the

pleadings." *Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 599 (6th Cir. 2012), *abrogated on

other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).  However, a court

may grant a motion based on an affirmative defense if "the plaintiff's own allegations show that

a defense exists that legally defeats the claim for relief." *Marsh v. Genentech, Inc.*, 693 F.3d

546, 555 (6th Cir. 2012).  At this stage, the Court finds that it cannot grant the Motion on the

basis of this affirmative defense, because the CAC's allegations do not clearly "show that [the

regulated exemption] legally defeats the claim for relief." *Id.*  While Defendants may continue

to argue that the exemption applies to the Michigan CPA claim, the Court determines that a

decision on this issue at the motion-to-dismiss stage would be premature, because the Court

cannot clearly find that Plaintiffs "anticipated the defense" when drafting the CAC. *Pfeil*, 671 F.3d at 599.

For the foregoing reasons, the Court will DENY Defendants' Motion as to Count XVII.

### q.   Count XVIII: MMPA

Missouri's MMPA prohibits "any deception, fraud . . . misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.  To establish a claim under the MMPA, a plaintiff must establish that he "(1) purchased merchandise from the defendant; (2) for personal, family, or household purposes; and that he (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the [MMPA]." *Bell v. Annie's, Inc.*, 673 F. Supp. 3d 993, 997 (E.D. Mo. 2023).  A person seeking to recover damages must also show "(a) [t]hat the person acted as a reasonable consumer would in light of all circumstances; (b) [t]hat the method, act, or practice . . . would cause a reasonable person to enter into the transaction that resulted in damages; and (c) [i]ndividual damages with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty." Mo. Rev. Stat. § 407.025(2).  Under the MMPA, "merchandise" includes "goods, commodities, intangibles, real estate or services." *Id.* § 407.010(4).

The Court has previously considered all of the grounds for dismissal asserted by Defendants that are relevant to Count XVIII. *See supra* Section III.D.1.b (failure to satisfy the heightened pleading standard for claims sounding in fraud); Section III.D.1.d (failure to allege an actionable misrepresentation); Section III.D.1.e (failure to allege unfair or deceptive conduct); Section III.D.1.g (failure to allege causation).  The Court has rejected Defendants' arguments on all of these grounds.  Further, the Court determined above that Plaintiffs' opening of their 360

Savings accounts constituted the purchase of services. *See supra* Section III.D.1.c. Thus, the opening of Plaintiffs' 360 Savings accounts qualifies as "merchandise" to trigger the MMPA's protections. Mo. Rev. Stat. § 407.010(4). Lastly, to the extent that the MMPA requires damages "to be calculated with a reasonable degree of certainty," the Court finds that Plaintiff Meresak will be able to submit "definitive and objective evidence" in the form of interest rate data and her 360 Savings account balance details following Defendants' alleged furtive relegation of 360 Savings in September 2019. *Id.* § 407.025(2); (CAC ¶¶ 67–70).

For these reasons, the Court will DENY Defendants' Motion as to Count XVIII.

### r.    Count XIX: Nebraska CPA

The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602. A claim under the Nebraska CPA requires a plaintiff to show that "(1) Defendants engaged in an act or practice that constitutes . . . a deceptive trade practice in the conduct of any trade or commerce; (2) Defendants' conduct affects the public interest; (3) Plaintiff was injured . . . by Defendants' . . . deceptive trade practice; and (4) [t]he nature and extent of plaintiff's damages." *Bassett v. Credit Bureau Servs., Inc.*, 554 F. Supp. 3d 1000, 1017 (D. Neb. 2021).

Defendants' Motion seeks to dismiss Count XIX on the following grounds: failure to meet the heightened pleading standard for claims sounding in fraud, failure to allege actionable misrepresentation, failure to allege unfair or deceptive conduct and failure to allege causation. The Court has already considered and rejected these arguments relative to all counts to which they apply, including Count XIX. *See supra* Section III.1.D.b, d–e, g. As required for a claim under the Nebraska CPA, the Court also finds that the alleged conduct clearly affects the public interest, as evidenced by not only the allegations of the individual Plaintiffs but also the putative

class allegations.  (CAC ¶¶ 119–29.)  The alleged actions have "widespread effects" on 360

Savings accountholders across the country and "implicate matters of public policy," as exhibited

by the various state legislatures' extensive efforts to protect consumers from fraudulent and

deceptive practices.  *Bassett*, 554 F. Supp. 3d at 1018.

As they did with the Michigan CPA claim (Count XVII), Defendants also assert a

separate challenge to contend that a statutory exemption defeats Plaintiffs' claim under the

Nebraska CPA.  (Mem. at 47.)  Under Nebraska law, the CPA does not apply to "actions or

transactions otherwise permitted, prohibited, or regulated under laws administered by . . . [a]

regulatory body or officer acting under the statutory authority of . . . the United States."  Neb.

Rev. Stat. § 59-1617(1).  Defendants assert that the NBA and OCC regulations specifically

authorize the acceptance of deposits by national banks, and therefore the Nebraska CPA claim

stands defeated.  (Mem. at 47.)  Plaintiffs counter that this argument fails, because the exemption

does not apply to "the various tactics [at issue]."  (Opp. at 60–61 (quoting *Bassett*, 554 F. Supp.

3d at 1016).)

As in the context of the Michigan CPA, the Court determines that it would be premature

to rule here on the affirmative defense at this stage in the litigation.  Further, the Court takes note

of *Bassett*, cited by Plaintiffs, in which the District Court of Nebraska found that "immunity

arises if the conduct itself is also regulated" and "[w]hile debt collectors are regulated and

licensed under [a state agency], the various tactics and means of collecting debts are not

regulated so as to exempt them from the [Nebraska CPA]."  554 F. Supp. 3d at 1016.  Here,

Plaintiffs' allegations concern the "tactics and means" utilized by Defendants, which Plaintiffs

claim constitute fraudulent, deceptive and unlawful conduct.  While the Court acknowledges that

the NBA and OCC regulations authorize national banks to collect deposits, that authorization

101

does not extend to the fraudulent or deceptive tactics and means alleged in the CAC. Accordingly, the Court finds that the "regulated transaction exemption" does not warrant dismissal of the Nebraska CPA claim at this stage.

For these reasons, the Court will DENY Defendants' Motion as to Count XIX.

### s.   Count XXI:  Delaware CFA

The Delaware CFA prohibits the use of any "deception, fraud . . . misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact . . . in connection with the sale, lease, receipt, or advertisement of any merchandise." Del. Code Ann. tit. 6, § 2513(a).  The statute defines "merchandise" to include "goods . . . or services." *Id.* § 2511(6).  Further, the statute "shall be liberally construed and applied" to "protect consumers . . . from unfair or deceptive merchandising practices." *Id.* § 2512.  A claim under the Delaware CFA requires a plaintiff to prove "(1) a defendant engaged in conduct which violated the statute; (2) the plaintiff was a 'victim' of the unlawful conduct; and (3) a causal relationship exists between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Lincoln v. Ford Motor Co.*, 2020 WL 5820985, at *6 (D. Md. Sept. 29, 2020).

The Court has previously considered all of the grounds for dismissal asserted by Defendants that are relevant to Count XXI.  *See supra* Section III.D.1.b (failure to satisfy the heightened pleading standard for claims sounding in fraud); Section III.D.1.c (failure to allege a consumer transaction via purchase of goods or services); Section III.D.1.d (failure to allege an actionable misrepresentation); Section III.D.1.e (failure to allege unfair or deceptive conduct); Section III.D.1.g (failure to allege causation).  The Court has rejected Defendants' arguments as to all of these grounds.

Accordingly, the Court will DENY Defendants' Motion as to Count XXI.

E.      **Count XXII:  Unjust Enrichment**

Defendants contend that Plaintiffs fail to state a claim for unjust enrichment, because

such a claim "arises out of their contractual relationships with Capital One." (Mem. at 62.)

Because an enforceable contract exists and the claim "seeks essentially the same remedy,"

Defendants assert that this claim should be dismissed. (Mem. at 63.)  Plaintiffs counter that the

claim is properly asserted, with the CAC alleging that Capital One reneged on its promise of

"high interest" for the 360 Savings account and "unjustly retained a benefit at Plaintiffs'

expense" by paying lower interest rates. (Opp. at 61 (citing CAC ¶¶ 46, 52, 81, 115(d)).)

Unjust enrichment "rests upon the doctrine that a man shall not be allowed to enrich

himself unjustly at the expense of another." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144,

165 (4th Cir. 2012) (quoting *Kern v. Freed Co., Inc.*, 299 S.E.2d 363, 365 (Va. 1983)). "The

doctrine of unjust enrichment enforces a 'contract implied in law' requiring one who accepts and

receives goods, services or money from another to reasonably compensate the person providing

those services." *Polykon Mfg. LLC v. GEA Process Eng'g Inc.*, 2024 WL 4183310, at *9 (E.D.

Va. Feb. 21, 2024) (quoting *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 647 (Va.

2020)).  To state a claim for unjust enrichment in Virginia, a plaintiff must show that "(1) the

plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should

reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the

benefit without paying for its value." *James G. Davis Constr. Corp.*, 841 S.E.2d at 650.

Parties cannot recover for both breach of contract and unjust enrichment, but they can

plead both theories in the alternative. *Harrell v. Colonial Holdings, Inc.*, 923 F. Supp. 2d 813,

826–27 (E.D. Va. 2013); *see also* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more

statements of a claim or defense alternatively or hypothetically, either in a single count or

defense or in separate ones."). However, while a plaintiff can "plead quasi-contractual claims in

the alternative when the applicability or enforceability of the contract is in dispute, the rationale

for alternative pleading disappears when neither party contests the applicability or validity of the

contract." *McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 810 (E.D. Va. 2017). In

*McPike*, this Court dismissed the plaintiff's unjust enrichment claim, because "neither party . . .

challenge[d] the validity and enforceability" of the contract at issue. *Id.*

Here, Plaintiffs seek to plead their claim for unjust enrichment in the alternative, alleging

that they "conferred a benefit on Capital One by maintaining their cash in 360 Savings accounts"

and received less interest than they should have rightfully received, with Defendants knowingly

retaining this money and unjustly profiting from the lower interest rate. (CAC ¶ 304.) Plaintiffs

then allege, "[i]n the absence of a contract, Plaintiffs and the Class have no adequate remedy at

law." (CAC ¶ 305.) However, as Defendants argue, Plaintiffs state in the CAC that they

"agree[d] to be bound" by the 360 Disclosures. (Mem. at 63 (quoting CAC ¶ 5).) Further, the

CAC alleges that the 360 Disclosures contain the terms applicable to their 360 Savings accounts,

such as the provision that "interest rates and annual percentage yields are variable and may

change at any time." (CAC ¶ 58.) Plaintiffs' sole contention regarding the 360 Disclosures is

that Defendants breached the implied duty of good faith and fair dealing through their alleged

fraudulent and deceptive conduct. (CAC ¶¶ 130–36.) Nowhere in the CAC do Plaintiffs dispute

the enforceability or validity of the 360 Disclosures as a binding contract.[22] Defendants

---

[22]     The Court acknowledges that, in their Opposition to Defendants' separate Motion to
Strike Jury Demand, (ECF No. 31), Plaintiffs do contend that the 360 Disclosures' jury trial
waiver provision is unenforceable. (ECF No. 38 at 7.) However, as Plaintiffs highlight, the 360
Disclosures also state that "[i]f any provision of these Terms is determined by a Court . . . to be
invalid, unenforceable, or illegal, that determination will not affect the validity and enforceability
of the remaining provisions of these Terms." (*Id.* at 15 (citing ECF No. 32-1 at 13).) Thus, even
while challenging the enforceability of the jury waiver provision within the context of the

similarly do not dispute the contract's enforceability. (Mem. at 62–63.) Accordingly, because "neither party contests the applicability or validity of the contract," the Court finds that Plaintiffs cannot maintain a claim for unjust enrichment in the alternative. *McPike*, 280 F. Supp. 3d at 810. Therefore, the Court will DISMISS Count XXII.

### F.    Count XXIII: Promissory Estoppel

"It is undisputed that Virginia law does not recognize the doctrine of promissory estoppel." *Alami v. Lincoln Prop. Co.*, 61 F. Supp. 3d 551, 560 (E.D. Va. 2014). Presumably in recognition of this black letter law, Plaintiffs seek to bring an alternative claim for promissory estoppel on behalf of fifteen of their state subclasses, to the exclusion of the Virginia subclass.[23] (CAC ¶¶ 307–11.)

However, as Defendants note, even assuming that Virginia law does not apply to this claim — which the Court does not need to address to resolve the claim — Plaintiffs' promissory estoppel claim fails under the laws of any of the other states for the same reason that their unjust enrichment claim fails. (Mem. at 64.) Because neither party disputes the enforceability or validity of the 360 Disclosures, the existence of the contract precludes any claim made in quasi-contract, which includes promissory estoppel. *See, e.g.*, *XPX Armor & Equip., Inc. v. SkyLIFE Co., Inc.*, 158 N.E.3d 1024, 1047 (Ohio Ct. App. 2020) ("Promissory estoppel is not an available remedy where the legal relationship of the parties is governed by a valid and enforceable

---

separate Motion to Strike, Plaintiffs do not suggest that invalidating that singular provision would have any effect on the overall contract's enforceability. Accordingly, for the purpose of resolving this Motion to Dismiss, the Court finds that Plaintiffs do not contest the enforceability or validity of the 360 Disclosures as a contract.

[23]    The claim includes the following state subclasses: California, Delaware, Florida, Georgia, Illinois, Maryland, Massachusetts, Missouri, Nebraska, New Jersey, New York, Ohio, Oregon, Pennsylvania and Texas.

contract."); *Malden Police Patrolman's Ass'n v. City of Malden*, 82 N.E.3d 1055, 1064 (Mass. App. Ct. 2017) ("Where an enforceable contract exists, however, a claim for promissory estoppel will not lie."); *Olson v. Hunter's Point Homes, LLC*, 964 N.E.2d 60, 66 (Ill. App. Ct. 2012) ("Promissory estoppel is unavailable when an enforceable contract between the parties exists."); *Folgers Architects Ltd. v. Kerns*, 633 N.W.2d 114, 121 (Neb. 2001) ("When an unambiguous contract exists that covers the issue for which damages are sought, promissory estoppel is not a viable theory of recovery.").

Accordingly, because the 360 Disclosures constitute a valid and enforceable contract, Plaintiffs fail to state a claim for promissory estoppel under the laws of any state and the Court will DISMISS Count XXIII.

## IV.    CONCLUSION

For the reasons set forth above, the Court will GRANT IN PART and DENY IN PART Defendants' Motion to Dismiss (ECF No. 29). This case shall proceed on all Counts, except for Counts XVI, XX, XXII and XXIII, of the Consolidated Amended Complaint against Defendants.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record, as well as the Special Master.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date: November 12, 2024